

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

---
## NO. AP-76,862
---

### EX PARTE GERARDO FLORES, Applicant

---
### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. CR-24959 IN THE 217TH DISTRICT COURT
### IN ANGELINA COUNTY
---

COCHRAN, J., delivered the opinion of the Court in which WOMACK, JOHNSON, KEASLER, and ALCALA, JJ., joined.  KELLER, P.J., filed a concurring opinion in which HERVEY, J., joined.  PRICE, J., concurred.  MEYERS, J., did not participate.

## O P I N I O N

A jury convicted applicant of two counts of capital murder for terminating his girlfriend's pregnancy by stepping on her abdomen, causing her twins to be delivered stillborn.  His convictions and life-imprisonment sentences were upheld on appeal by both the court of appeals[1] and this Court.[2]  Applicant filed a post-conviction application for a writ

---

[1] *Flores v. State*, 215 S.W.3d 520 (Tex. App.—Beaumont 2007).

[2] *Flores v. State*, 245 S.W.3d 432 (Tex. Crim. App. 2008).

of habeas corpus alleging that his trial and appellate attorney provided ineffective assistance of counsel under the Sixth Amendment.[3]  After holding a hearing and taking additional evidence, the habeas judge[4] filed findings of fact and conclusions of law recommending that this Court grant relief on two ineffective assistance of counsel claims: (1) failing to present the expert testimony of Drs. Harvey Kliman and Robert Bux at trial, and (2) failing to raise sufficiency of the evidence on direct appeal.  However, rather than provide us with findings of fact that resolve the disputed facts, the trial judge made findings that are largely a recitation of the evidence presented at the writ hearing.  Because these findings are not helpful to us in resolving the issues for which the case was remanded, we must conduct our own independent review of the evidence. After so doing, we deny relief.

I.

Applicant and his girlfriend, E.B., were both in high school when they began dating. They had been seeing each other for over a year when, in February of 2004, E.B. discovered that she was pregnant with twins.  E.B. was sixteen and applicant was eighteen. E.B. eventually moved from her brother's house to applicant's family's home.  E.B.'s pregnancy seemed to be a normal one.  She visited her obstetrician, Dr. Jerry Johnson, regularly. During her first visit, E.B. was given the approximate due date of September 13th, and told that she was pregnant with twins. The next month, Dr. Johnson noted that there were no complaints

---

[3] U.S. CONST. amend. VI.

[4] Judge Wilson presided over the trial, but he left the bench in 2006, and Judge Bryan supervised the habeas hearing in 2010-2011.

and the pregnancy was progressing as expected.[5]  On April 30th, E.B. complained of "spotting, bright red blood," which Dr. Johnson noted was potentially a cause for concern but not exceedingly uncommon.  Dr. Johnson performed an ultrasound whose results indicated that the pregnancy was still a healthy one.[6]  At no point during any of E.B.'s visits did Dr. Johnson or his staff notice any bruising on E.B.

On May 7th, E.B. prematurely delivered two stillborn fetuses; they were between 20 and 21 weeks old.  At the time of their premature birth, the twins had been dead *in utero* for between twenty-four and forty-eight hours.  Emergency personnel took E.B. to Lufkin Memorial Hospital where nurses noticed she had "massive bruising" "all the way across" her abdomen, as well as fingerprint-like bruising underneath her right arm.  The nurses tried to get E.B. to tell them who or what had caused the bruises, but E.B. refused to give them any information.  The nurses reported E.B.'s condition to the Lufkin Police.  After speaking to E.B., her doctors, and applicant, police determined that applicant was likely responsible for E.B.'s physical abuse  which caused the premature delivery of the twins.  Applicant was then arrested and charged with capital murder for causing the deaths of the fetuses.

Causation was a central contested issue at trial; both applicant and the State presented

_____

[5] Dr. Johnson offered E.B. a "Triple Screen" or "Quad Screen" test on March 22nd.  The test is designed to detect birth defects early in the pregnancy, so that the woman can terminate her pregnancy legally and safely if the results are positive.  E.B. declined to have the test because she was "opposed to abortion."

[6] After getting the ultrasound results, E.B. called Dr. Johnson back into the room and asked about terminating her pregnancy. Dr. Johnson told her that, "in his opinion, [it] was too late for it to be safely done."

substantial testimony as to what caused the deaths. Three theories of causation were presented: (1) Applicant committed homicide by stepping on E.B.'s abdomen; (2) E.B.'s self-inflicted wounds caused the miscarriage; and (3) the fetuses died from a genetic abnormality.

The State's theory was that applicant stepped on E.B.'s stomach, applying enough pressure to cause the twins' death. E.B's obstetrician, Dr. Johnson, arrived at the hospital shortly after E.B. was brought in. He described E.B.'s physical condition:

> There was bruising over the right cheek bone. Her lip was cracked. There was blood apparent on both lips. The lips were both swollen, but I did not see any lacerations or any tears in the lips. Both upper arms had bruising which, in my opinion, appeared to be consistent with injuries from a finger grasp around the arm. . . . Her back and buttocks had no evidence of any trauma. The left breast had an old bruise. There was no new bruising evident on the left breast. Most of her bruising was over the abdomen, and it was around the level of the umbilicus, or the belly button, from . . . side to side going all the way across the abdomen.[7]

Dr. Johnson explained that it was unlikely that a pregnant woman—given the expanded size of her abdomen—could inflict these abdominal bruises on herself, especially since they were inflicted with enough force to cause a miscarriage.

Post-delivery testing, conducted by Lufkin Memorial Hospital Pathologist Dr. David Todd, revealed that E.B. had recent infarction[8] in her uterus. Dr. Todd explained that the

---

[7] Dr. Johnson asked E.B. who inflicted the bruises on her. In response, E.B. asked if the conversation would be confidential. Dr. Johnson said that, if he felt there was evidence of an ongoing crime against her or her unborn children, he would be required to report it to the police. E.B. then explained that if she told him, he would have to call the police. E.B. did not further discuss her bruises with Dr. Johnson.

[8] Infarction is a medical term for dead tissue, or cell death. Infarction can result from physical trauma, viral infection, or a lack of blood flow.

infarctions were about 24-48 hours old, and likely caused the death of the fetuses *in utero*.[9]

Dr. Todd concluded that such infarction was consistent with blunt force trauma and not the result of any genetic defect.

Finally, the State called Dr. Tommy J. Brown, who conducted the autopsies of the twin fetuses. Dr. Brown noted that the twins

> were markedly macerated. By macerated that means if the fetus had been dead in utero for at least 24 hours or more, then the skin will slough off due to the autolytic of the juice's work on the skin of the baby . . . . In other words, the superficial area of the skin is sloughed off and it has a markedly reddened skin. And both babies had that over their entire bodies except for the soles of their feet and their fingers, and that means they've been dead in utero for days.

After conducting the autopsy, Dr. Brown concluded that the cause of death was "intrauterine fetal demise . . . due to blunt force abdominal trauma to the mother." Dr. Brown also looked at the photographs of E.B.'s abdominal bruises. He determined that the bruising was between three and six days old and consistent with E.B.'s being stepped on by a human foot. He did not notice any signs of genetic defects, but noted that, even if there were a genetic disorder, it would not necessarily have resulted in the twins' deaths. Dr. Brown stated unequivocally, "In this instance the babies died from blunt force trauma to the mother," which was consistent with being stepped on.

In a series of written and oral statements given both before and after his arrest, applicant admitted to striking E.B. the night before her premature delivery. Applicant also

---

[9] Dr. Todd obtained a second opinion from Dr. Popek, a pediatric placenta pathologist at Texas Children's Hospital. Dr. Popek agreed with Dr. Todd's assessment.

admitted to stepping on E.B.'s stomach after she returned home from the April 30th doctor's appointment where she learned that it was too late for a safe abortion. In his defense, applicant called E.B. who testified that she wanted an abortion and, upon learning that she was too far along in her pregnancy to obtain one, asked applicant for his help.[10] She explained that, at her request, applicant stepped on her stomach twice–once one week before and once two weeks before the premature delivery. E.B. admitted to getting into a fight with applicant the night before the premature delivery, during which he hit her in the face, but she claimed that the bruises did not come from any intentional conduct on his part.[11] E.B. also testified to "hit[ting herself] right on the stomach more than ten times," in the hope of terminating her pregnancy.[12]

The State's theory was that E.B. was "under the spell" of applicant, and that her testimony was calculated to cover up his abusive behavior. In its cross-examination, the State focused on E.B.'s relationship with applicant[13] and her earlier-expressed desire to carry

---

[10] E.B.'s testimony corroborated applicant's statement that he initially refused to accede to her requests but gave in over time.

[11] E.B. testified that some of the bruising was due to the couple "messing with each other" while watching television in bed.

[12] She also said that she did not take her prenatal vitamins and that she took walks around the neighborhood against her doctor's orders.

[13] E.B. admitted that the couple argued with some regularity. She explained that they would often raise their voices at each other, occasionally resulting in applicant's father coming in to make sure everything was alright. E.B. also admitted to fabricating some facts in her statement to the local newspaper because "they were describing [applicant] real ugly."

her pregnancy to term.[14] The State also called a rebuttal witness to testify to various psychological issues, including the seemingly irrational impulse of an abused person to protect the abuser that may arise when someone is in an abusive relationship.

To support his theory that the twins died from a genetic defect, applicant called Dr. Stephen Pustilnik, the Chief Medical Examiner for Galveston County. Dr. Pustilnik was not a treating doctor, but he reviewed hospital records, the autopsy report, and microscopic slides of the twins' tissue and of the placenta. He testified that E.B's pregnancy was not as normal and healthy as the State's experts described, noting the possibility that the premature birth could have been caused by a genetic defect. Dr. Pustilnik noted, "The placenta has evidence of disease in it. . . . It has evidence of possibly having a significant genetic disease. It has evidence of the placenta coming away from the wall of the uterus[.]"[15]  Dr. Pustilnik explained that the "infarction" or dead tissue was more consistent with the cells dying slowly over a period of time rather than suddenly as the State's witnesses had testified.

Dr. Pustilnik could not, however, rule out the possibility that physical trauma caused

---

[14] For instance, on cross-examination, E.B. said that she never wanted to have an abortion, that she named the twins, that she held a funeral for them, and that she regularly attended their grave sites.

[15]  The "evidence of disease" Dr. Pustilnik refers to is the presence of trophoblastic inclusions. He explained that the presence of trophoblastic inclusions may, but will not necessarily, result in genetic abnormalities:

> For someone who is—who is going to lose their pregnancy—the trophoblastic inclusions are a marker, and identifier, of a diseased placenta in the vast majority of cases. When you see them—when you see them in a placenta, that placenta in the vast majority of cases has a genetic problem to it.

the deaths. When asked for his conclusion as to the cause of death, he responded:

> One possibility is multiple blows to the abdomen [can] cause an abruption of the placenta from the inside of the uterus. A second cause is steady, constant, deep pressure to the abdomen of a pregnant woman can cause abruption of the placenta and peeling away of the placenta from the uterus. And the third thing is we have a placenta that has a natural disease to it that is also waiting to pull itself away and be rejected from the inside of the uterine cavity.

In sum, Dr. Pustilnik believed that it was possible, but not certain, that the twins died due to a genetic defect.

After considering all the evidence, the jury found applicant guilty and sentenced him to life in prison on both counts.  On direct appeal, applicant was represented by the same counsel who represented him at trial. Counsel raised ten issues, which were arranged in three groups. The court of appeals affirmed,[16] but because applicant presented novel and important issues of state law, this Court granted his petition for discretionary review.  Ultimately we affirmed his conviction.[17]

Applicant then filed an application for a writ of habeas corpus raising twelve constitutional claims.[18]  We remanded the case to the habeas court for further factual development of two of the ineffective assistance of counsel claims. In response, the habeas judge entered eight pages of findings of facts and conclusions of law, ultimately

---

[16] *Flores v. State*, 215 S.W.3d 520 (Tex. App.—Beaumont 2007).

[17] *Flores v. State*, 245 S.W.3d 432 (Tex. Crim. App. 2008).

[18]  Applicant raised numerous ineffective assistance of counsel claims as well as various due process, equal protection, and overbreadth constitutional claims.

recommending that relief be granted.  We filed and set this case to address applicant's ineffective assistance of counsel issues.

## II.

A criminal defendant is guaranteed the right to representation throughout the trial process.[19]  This Sixth Amendment right to counsel preserves the fairness, consistency, and reliability of criminal proceedings by ensuring that the process is an adversarial one.[20]  A petitioner may establish a claim of ineffective assistance of counsel by proving, by a preponderance of the evidence, that counsel's performance fell "below an objective standard of reasonableness" and that such deficient performance actually prejudiced the defendant.[21]

There is a strong presumption that counsel's conduct was reasonable; indeed, strategic decisions "'made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'"[22]  Counsel's conscious decision not to pursue a defense or to call a witness is not insulated from review,[23] but, unless a defendant overcomes the presumption that counsel's actions were based in sound trial strategy, counsel will generally

---

[19]  U.S. Const. amend. VI; Tex. Const. art. I § 10.

[20]  *See Martinez v. Ryan*, 132 S.Ct. 1309, 1317-18 (2012) ("[T]he right to counsel is the foundation for our adversary system").

[21]  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

[22]  *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 690–91).

[23]  *See Ex parte Briggs*, 187 S.W.3d 458, 467 (Tex. Crim. App. 2005) (retained counsel's decision not to fully investigate defendant's case or consult with experts until he was paid in advance for the expert's fees was ineffective assistance of counsel because counsel's reason was not a "strategic" decision, but an "economic" one).

not be found ineffective.[24]

Additionally, "[i]t is not enough to show that trial counsel's errors had some conceivable effect on the outcome" of the proceeding.[25] Rather, the applicant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."[26] A reasonable probability is one sufficient to undermine confidence in the outcome.[27] Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial,[28] not through 20/20 hindsight.[29]

In *Ake v. Oklahoma*,[30] the Supreme Court explained that the United States Constitution requires that an indigent defendant be granted access to expert assistance if "the expert can provide assistance which is 'likely to be a significant factor' at trial."[31] However,

---

[24] *Ex parte Rogers*, 369 S.W.3d 858, 862 (Tex. Crim. App. 2012) (citing *Strickland*, 466 U.S. at 689).

[25] *Id.* at 863 (citing *Strickland*, 466 U.S. at 693).

[26] *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).

[27] *Hernandez v. State*, 726 S.W.2d 53, 55 (Tex. Crim. App. 1986).

[28] *Strickland*, 466 U.S. at 688 (referring to "prevailing professional norms"); *Ex parte Butler*, 884 S.W.2d 782, 783-84 (Tex. Crim. App. 1994) (noting that counsel's performance is to be judged by the law at the time of trial).

[29] *Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990) ("The [*Strickland*] test is to be applied at the time of trial, not through hindsight.").

[30] 470 U.S. 68 (1985).

[31] *Taylor v. State*, 939 S.W.2d 148, 152 (Tex. Crim. App. 1996) (citing *Rey v. State*, 897 S.W.2d 333, 339 (Tex. Crim. App. 1995) (quoting *Ake*, 470 U.S. at 74)).

a defendant is not entitled to the expert of his choice[32] or to a "team of experts" merely because multiple experts testify for the State.[33]  *Ake* and its progeny are concerned with reliability, not equality:  Was the expert assistance provided to the defendant so lacking or so meager as to create a "high risk of an inaccurate verdict"?[34]  If the answer is no, then the State has fulfilled its constitutional obligation because a defendant is guaranteed a fair trial designed to ensure a reliable verdict, not a perfect trial.[35]

## III.

As an introductory matter, we will assume our role as the ultimate fact finder in this case.[36]  The factual findings entered by the trial judge in this case do not assist us because they fail to resolve the disputed issues—they merely repeat and restate the parties' arguments.[37]  The habeas judge is "[u]niquely situated to observe the demeanor of witnesses

---

[32]  *Ake*, 470 U.S. at 83.

[33]  *See Ex parte Jimenez*, 364 S.W.3d 866, 877-88 (Tex. Crim. App. 2012).

[34]  *Busby v. State*, 990 S.W.2d 263, 271 (Tex. Crim. App. 1999); *see Ake*, 470 U.S. at 82 ("without the assistance of a psychiatrist to conduct a professional examination on issues relevant to the defense, to help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examination of a State's psychiatric witnesses, the risk of an inaccurate resolution of sanity issues is extremely high.").

[35]  *Cf. Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986) ("[T]he constitution entitles a criminal defendant to a fair trial, not a perfect one.").

[36]  *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008); *see also Ex parte Van Alstyne*, 239 S.W.3d 815, 817 (Tex. Crim. App. 2007) (per curiam); *Ex parte Simpson,* 136 S.W.3d 660, 668–69 (Tex. Crim. App. 2004).

[37]  The findings of fact read more like a summary of the parties' arguments. For example, the finding relating to counsel's failure to challenge sufficiency of the evidence on appeal states,

first-hand,"[38] and his findings and conclusions are generally accorded great deference, but when the findings are not supported by the record, or–as in this case–do not resolve the necessary factual issues, the rationale for this deference disappears.[39]  Because the habeas judge's findings do not resolve the disputed fact issues, this Court must exercise its role as the ultimate finder of fact.[40]

**A.    Applicant's Attorney Was Not Ineffective For Failing to Call Additional or**

---

Flores raises the claim that defense counsel rendered ineffective assistance of counsel on direct appeal by failing to raise a claim that the evidence that Flores caused the deaths was insufficient.
    Defense counsel did not raise insufficiency of the evidence on direct appeal. In his first response to this claim defense counsel stated "... it was not a strategic decision not to raise this issue on appeal, just an issue that didn't occur to me." Two years later, defense counsel testified, at an evidentiary hearing, that he did not raise sufficiency of the evidence on appeal based on a generalized feeling that there was not a chance of being successful on that issue.

This "finding of fact" fails to explain which version of defense counsel's testimony the habeas judge credited and whether counsel's decision to not bring an appellate claim of insufficient evidence was (or was not) a strategic decision based on an assumption that it would not likely to successful.

[38]  *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008).

[39]  *Id.* at 727-28 ("When our independent review of the record reveals findings and conclusions that are unsupported by the record, we will, understandably, become skeptical as to the reliability of the findings and conclusions as a whole. In such cases, we will proceed cautiously with a view toward exercising our own judgment. And when we deem it necessary, we will enter alternative or contrary findings and conclusions that the record supports. Furthermore, when we determine that the trial judge's findings and conclusions that are supported by the record require clarification or supplementation, we may exercise our judgment and make findings and conclusions that the record supports and that are necessary to our independent review and ultimate disposition.").

[40]  *Ex parte Jimenez*, 364 S.W.3d 866, 870 (Tex. Crim. App. 2012) ("As the ultimate fact finder, we will 'exercise our authority to make contrary or alternative findings and conclusions' when necessary") (quoting *Reed*, 271 S.W.3d at 727-28).

**Different Expert Witnesses.**

1.    *Dr. Kliman.* Applicant claims that his trial counsel should have retained and called Dr. Harvey Kliman, a leading authority in trophoblastic inclusions, as an expert witness because Dr. Kliman could have proven that applicant's actions "absolutely" did not cause the deaths of the fetuses. Dr. Kliman's testimony, applicant claims, would have been "much more forceful and certain" than Dr. Pustilnik's and, therefore, by not calling Dr. Kliman, trial counsel was constitutionally ineffective.

In support of his claim, applicant attached an affidavit from Dr. Kliman. After examining the slides of E.B.'s placenta, Dr. Kliman stated:

> [E.B.'s] fetus' placentas showed definite signs of a genetic abnormality. . . . [E.B] also had a clinical history of bleeding throughout this pregnancy. When I find such abnormalities in a placenta and the patient has a history of bleeding in both the first and second trimesters, that pregnancy will result in miscarriage virtually one hundred percent of the time. The abnormalities I found in this placenta definitely were the basis of her miscarriage. . . . Whatever else may have been done to her was irrelevant to the deaths of the twin fetuses.[41]

At trial, counsel called Dr. Pustilnik, Chief Medical Examiner for Galveston County, and a former student of Dr. Kliman.[42] Trial counsel testified, at the habeas hearing, that he

---

[41] The habeas judge found that "[b]ased on the evidence presented in this writ proceeding Dr. Kliman's testimony would have been that in his opinion to the highest degree of medical certainty after reviewing the pathology that there is no possibility that Flores' actions could have caused the double fetal demise." We agree that this would have been Dr. Kliman's testimony, but that finding does not resolve the factual question of whether that testimony was credible or was likely to be credited by a jury.

[42] Dr. Pustilnik was clearly a qualified expert. In addition to serving as the Chief Medical Examiner for Galveston County, he was an Assistant Professor of Pathology at the University of Texas Medical Branch in Galveston. He obtained his medical degree from

had used Dr. Pustilnik in the past and found him to be a "very good, knowledgeable expert [who] testifies very well" and was adept at relating complex medical information to a jury. Counsel noted that, while Dr. Kliman was a researcher, Dr. Pustilnik was a "hands-on forensic pathologist" whom he had used before with positive results.[43] Moreover, Dr. Pustilnik was a local medical examiner employed by the University of Texas, whereas Dr. Kliman was an "academic" from an elite, east-coast Ivy-League college.

While Dr. Kliman notes in his habeas affidavit that he was available to testify at trial and would have done so without charge, he never informed counsel of his willingness to do so.[44] Indeed, trial counsel testified that he did not recall speaking with Dr. Kliman at all prior to trial. Counsel was, however, made aware of Dr. Kliman and his expertise in the field of trophoblastic inclusions through conversations with Dr. Pustilnik.  Dr. Kliman's name came up a few weeks before trial when Dr. Pustilnik brought up the "alternative theory" of causation that E.B.'s pregnancy was "doomed from the start" because of genetic defects in her uterus.  Dr. Pustilnik explained to counsel that he could testify effectively to this theory

---

Washington University and was a resident at Yale University. He also completed a one-year fellowship at the Dade County Medical Examiner's Office in Miami, Florida. He has testified in numerous criminal cases, often for the State.

[43] Shortly before applicant's trial, counsel had retained Dr. Pustilnik as a testifying expert in a case that resulted in a mistrial because the jury could not unanimously determine guilt.

[44] Counsel stated, on the habeas record, that had he known Dr. Kliman was "a necessity" and available to testify and would do so at no cost, he would not have hesitated to call him. Indeed, it is hard to imagine trial counsel declining the offer of a free expert who is willing to spend his own time and money to travel to Texas to testify unless counsel had previously determined that the expert would not play well to a Texas jury.

of causation, and he never mentioned any need for Dr. Kliman's testimony in addition to, or

instead of, his own.

Given the state of the habeas record, we cannot say that trial counsel's performance

"fell below an objective standard of reasonableness" when he selected Dr. Pustilnik as his

expert witness.[45]  Trial counsel's duty does not extend to obtaining the "best"or most highly

qualified (but perhaps pompous, bombastic, or incomprehensible) expert in the nation.[46]

Instead, it is to investigate the facts of the case and determine if an expert is necessary to

present the defendant's case to the jury and, if so, to obtain competent expert assistance.[47] As

courts in this and other jurisdictions have noted, the proper focus is on counsel's

investigation, not counsel's  choice of a specific expert.[48]

---

[45]  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).

[46]  *See Ex parte Jimenez*, 364 S.W.3d 866, 884-85, 887-88 (Tex. Crim. App. 2012).

[47]  *See Rey v. State*, 897 S.W.2d 333, 340 (Tex. Crim. App. 1995) (capital murder defendant entitled to assistance of forensic pathologist based upon counsel's investigation and threshold showing that cause of victim's death was likely to be a significant factor at trial); *see also Wiggins v. Smith*, 539 U.S. 510, 527 (2003) ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. [A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.") (quoting *Strickland*, 466 U.S. at 690-91).

[48]  *See, e.g.*, *Crittenden v. Ayers*, 624 F.3d 943, 965-66 (9th Cir. 2010) ("Attorneys are entitled to rely on the opinions of properly selected, adequately informed and well-qualified experts."); *Richards v. State*, 932 S.W.2d 213, 214-15 (Tex. App.—El Paso 1996, pet. ref'd) (*Ake* was not violated when trial judge appointed a Texas psychologist rather than a California expert on post-traumatic stress disorder who "may have had more impressive credentials" because the defendant failed to prove that the expert appointed was incompetent to assist defendant on his PTSD based defense); *McLaughlin v. State*, 378 S.W.3d 328,343, (Mo. 2012) ("Trial counsel's selection of which expert witnesses to call at trial is generally a question of trial strategy and is virtually unchallengeable. . . . [C]ounsel is not obligated to shop for an expert

Applicant was provided exactly what he was constitutionally entitled to. After an investigation into the facts, counsel determined that expert assistance was necessary, so he retained a well-known, highly qualified, local expert with whom he had worked before and who he knew testified well in front of a jury. When asked, Dr. Pustilnik assured counsel that he would be able to testify to the causation issue, leaving counsel with no reason to look elsewhere.[49] Applicant was entitled to competent expert assistance, and he received it.

Moreover, calling Dr. Kliman could have presented potential pitfalls for the defense. For instance, the Angelina County jurors might not have been especially receptive to an expert traveling halfway across the country—from Yale—to testify in their small-town, East-Texas courthouse. Although neither trial counsel nor the habeas judge have had the opportunity to actually see and hear Dr. Kliman in person, applicant notes the differences in the doctors' presentation styles, with Dr. Kliman being "much more forceful and certain."[50] As an experienced local attorney, trial counsel made a strategic decision to choose an expert he thought would be the most appealing to the jury he would be appearing in front of. Such a decision is one to which we will defer.

Applicant has also failed to show how he was prejudiced by his trial attorney's alleged

---

witness who might provide the most or more favorable testimony.") (internal citation omitted).

[49] *See Martinez v. State*, 195 S.W.3d 713, 721 (Tex. Crim. App. 2006) ("When assessing the reasonableness of an attorney's investigation, a reviewing court must consider the quantum of evidence already known to counsel and whether the known evidence would lead a reasonable attorney to investigate further.") (citing *Wiggins* 539 U.S. at 527).

[50] Application for Habeas Corpus Relief at 33.

deficient conduct. The only difference between the two doctors' testimony is that Dr. Kliman was more forceful and certain in his conclusion that applicant's actions did not cause the twins' deaths. Applicant argues that, if the jury had heard this more forceful testimony, it would have acquitted him. However, this logic fails to take two factors into account. First, even if the jury had been presented with Dr. Kliman's testimony, it would still be entitled to reject it and convict applicant; nothing about Dr. Kliman's testimony guaranteed an acquittal. Second, as the habeas record shows, if Dr. Kliman had testified, the State would have subjected him to vigorous cross-examination and would have called counter-experts to testify that Dr. Kliman's theories were "junk science."[51] In short, by calling Dr. Kliman, the defense would have merely escalated the "battle of the experts," but not changed the ultimate disputed fact that the jury had to decide: what caused the twins' deaths.

2.    *Dr. Bux*. Applicant also claims that trial counsel was ineffective for failing to call Dr. Robert Bux, the Chief Medical Examiner of Colorado Springs, Colorado. Applicant

---

[51] Dr. Johnson, E.B.'s obstetrician, submitted an affidavit in the habeas proceeding stating that Dr. Kliman's statements were "factually inaccurate" and "full of what is referred to in the literature as 'junk science.'" He argued that it was "appalling" that Dr. Kliman could be "so grossly negligent," and he described Dr. Kliman's statement that E.B. suffered bleeding "throughout the pregnancy " as misleading and inaccurate. Dr. Johnson criticized Dr. Kliman's attack on Dr. Todd's work and concluded that Dr. Kliman was clearly "biased and inaccurate."

The State also submitted the affidavit of Dr. Edwina J. Popek, a professor of pathology at Baylor College of Medicine and the Director of Anatomic Pathology at Texas Children's Hospital. She reviewed some of the evidence in this case and noted that the slides of E.B.'s placenta did show the presence of trophoblastic inclusions, but that those inclusions did not indicate a genetic abnormality or cause the twins' premature births. She stated that Dr. Kliman's opinion is "considered to be outside the mainstream of placental pathology and could be fairly labeled as junk science."

claims that Dr. Brown's conclusions regarding the cause of death "derive more from what the State needed him to say than from his autopsy," and Dr. Bux's affidavit "points out the failings in Dr. Brown's evidence."[52]

In his habeas affidavit, Dr. Bux states, "There is nothing in the autopsy report or in Dr. Brown's testimony to show what caused the deaths of these fetuses. . . . There is no medical evidence from the autopsy of the fetuses that their deaths were the result of homicide or of any action of Gerardo Flores." While this testimony does directly contradict that of the State's expert, Dr. Bux's ultimate conclusion was no different from, and provided nothing more than, that of Dr. Pustilnik's.[53] Applicant has not explained how, if at all, Dr. Bux's testimony would have affected the outcome of the proceeding.[54]

The habeas judge concluded that had trial counsel called either Dr. Kliman or Dr. Bux, their testimony would have been "of some benefit to the defense by raising a clear refutation of the State's theory." The habeas judge noted that jurors could have accepted or rejected

---

[52] Application for Habeas Corpus Relief at 31.

[53] Dr. Bux's testimony would have been cumulative of Dr. Pustilnik's. Applicant cannot show prejudice for failure to call a witness whose testimony would be cumulative of an expert who did testify. *See*, *e.g.*, Crawford v. State, 355 S.W.3d 193, 199 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (trial counsel in evading arrest trial was not ineffective for failing to call a passenger who was in defendant's car at time defendant failed to comply with police officer's instructions as defendant did not identify any fact to which witness would testify that trial court had not already heard from another witness); *Tutt v. State*, 940 S.W.2d 114, 121 (Tex. App.—Tyler 1996, pet. ref'd) (DWI defendant's trial counsel was not ineffective for failing to call certain witnesses when their testimony would have been cumulative of other testimony).

[54] *Id.* ("'failure to call witnesses at the guilt-innocence and punishment stages is irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony.'") (quoting *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983)).

that testimony, but, because it was not offered, the jurors did not have that opportunity, and therefore applicant was prejudiced. But "some benefit" is not the correct prejudice standard under *Strickland*. The correct standard is that the evidence establishes a reasonable probability that the result would have been different, and a reasonable probability is one "sufficient to undermine confidence in the outcome."[55] Prejudice is not established merely by a showing that calling additional experts would have provided "an opportunity" for additional, albeit hotly contested and disputed, expert testimony.

In sum, applicant has failed to prove, by a preponderance of the evidence, that trial counsel's performance was constitutionally deficient or that, had the defense called Drs. Kliman or Bux, the outcome of the trial would have been reasonably likely to end in a different result.[56]

## B. Applicant's Counsel Was Not Ineffective For Failing To Challenge Sufficiency of the Evidence on Direct Appeal.

Applicant claims that he is entitled to a new trial because his appellate attorney failed to raise a claim regarding insufficient evidence.[57] Applicant correctly notes that there were three possible causes of death presented at trial and no expert could definitively state which

---

[55] *Strickland*, 446 U.S. at 694.

[56] *See id.*

[57] Even if applicant prevailed on the merits of this claim, he would be entitled only to another direct appeal, not a new trial. *Ex parte Daigle*, 848 S.W.2d 691, 692 (Tex. Crim. App. 1993) (habeas applicant was entitled to a new appeal based on appellate counsel's ineffectiveness for failing to raise point of error on appeal concerning trial court's denial of defendant's timely request for jury shuffle, which, under then-prevailing law, was automatic reversible error).

of the three possible causes was the actual cause of death. Because of this, applicant claims that counsel was ineffective for failing to challenge sufficiency of the evidence on appeal.

To obtain relief in the form of a new direct appeal on a claim of ineffective assistance of appellate counsel, applicant must show that "(1) counsel's decision not to raise a particular point of error was objectively unreasonable, and (2) there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal."[58] An attorney "need not advance *every* argument, regardless of merit, urged by the appellant,"[59] but if "appellate counsel fails to raise a claim that has indisputable merit under well-settled law and would necessarily result in reversible error, appellate counsel is ineffective for failing to raise it."[60]

In this habeas proceeding, appellate counsel admitted that causation was a hotly contested issue at trial and nothing prevented him from raising it on appeal. However, counsel also testified that he "was really focused on the constitutional issues," and "didn't think [we] had a chance on the sufficiency of the evidence" issue. His strategy instead was to "limit [the appeal] as much as possible for the Court of Appeals" because he wanted to

---

[58] *Ex parte Miller*, 330 S.W.3d 610, 623 (Tex. Crim. App. 2009) (internal quotation marks omitted); *Ex parte Santana*, 227 S.W.3d 700, 704–05 (Tex. Crim. App. 2007); *see also Smith v. Robbins*, 528 U.S. 259, 285–86 (2000).

[59] *Evitts v. Lucey,* 469 U.S. 387, 394 (1985); *see also Schaetzle v. Cockrell*, 343 F.3d 440, 445 (5th Cir. 2003) ("Counsel need not raise every nonfrivolous ground of appeal, but should instead present solid, meritorious arguments based on directly controlling precedent.") (internal quotation marks and alterations omitted).

[60] *Ex parte Miller*, 330 S.W.3d at 624.

"make it as clear as possible."  In so doing, counsel raised ten claims, grouped into three main areas: the constitutionality of the statute; the admission of evidence of an extraneous offense; and an improper/inadequate jury charge.[61]

Counsel was reasonable in his determination that a challenge to legal sufficiency was not likely to be fruitful. Applicant admitted that E.B. repeatedly asked him to help her abort the fetuses. He also admitted to acceding to her requests and described, in detail, how he went about it.  E.B. had bruises consistent with applicant's admissions.

Dr. Todd examined the placenta after E.B.'s miscarriage and noted that there were several possible causes of death, but that the damage to the placenta was most consistent with trauma.[62]  Dr. Brown's testimony was based on the autopsies he conducted of the twins. He explained that the cause of death was blunt force trauma and was consistent with being stepped on.[63] Dr. Johnson, E.B.'s obstetrician, was at the hospital the day E.B. was admitted and saw her bruises first-hand. He testified that some of the bruises looked as though they

---

[61] The fact that this Court granted applicant's petition for discretionary review speaks to the validity of the claims counsel chose to raise.

[62] Applicant faults Dr. Todd for not explaining whose actions caused the trauma– whether it was E.B's or applicant's.  The identity of the person who inflicted trauma is not an issue of medical expertise; that is a jury issue. The evidence was sufficient for a jury finding of either cause.

[63] Dr. Bux, in his affidavit, stated that Dr. Brown "offered no testimony to show what caused the deaths of these fetuses" and notes that he did not match applicant's shoe to the bruise on E.B.'s abdomen. While Dr. Brown did not explain precisely how the blunt force could cause the deaths, Dr. Todd did. There is no requirement that one expert prove every element of the State's case.  Dr. Brown cannot be faulted for failing to compare applicant's shoe pattern to the bruises on E.B.'s abdomen as that forensic comparison is outside his medical expertise.

had been made by a foot. He explained that he could not be positive as to the cause of death; it could have been caused by E.B.'s hitting herself or by someone's standing on her stomach. Finally, Dr. Pustilnik explained that he found trophoblastic inclusions in E.B.'s placenta which can indicate genetic abnormality and may result in spontaneous abortion.[64]

It is true that none of the experts was positive that applicant's actions were what caused the deaths. However, several experts testified that his actions could have been the cause. Other experts claimed that it was impossible to tell exactly what the cause of death was. It was the province of the jury to "'fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."[65] When the evidence supports "reasonably equal competing theories of causation," it is the jury's duty to determine which theory is the true one, and their decision will be upheld on review.[66] Appellate courts are not to disturb a jury's findings on these matters unless no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[67] Here, given the evidence presented at trial, and "considering all the evidence in the light most favorable to the verdict," it is difficult to see how a claim of insufficient evidence could have

---

[64] Dr. Pustilnik also testified, "I can't put my finger on one specific cause of death because we've got several good possibilities here."

[65] *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)).

[66] *See Goodman v. State*, 66 S.W.3d 283, 287 (Tex. Crim. App. 2001) (noting that it is the jury's duty to "accept[] or reject[] reasonably equal competing theories of causation").

[67] *Brooks v. State*, 323 S.W.3d 893, 902, 912 (Tex. Crim. App. 2010).

been successful.[68] At a minimum, it is not a "clearly stronger" issue than those that applicant's counsel did bring on appeal.[69]

In support of his claim, applicant relies on *Grotti v. State*,[70] a prosecution for criminally negligent homicide by a physician for blocking the breathing tube of a dying patient. Applicant's reliance on *Grotti* is misplaced for several reasons. First, *Grotti* was reversed for *factual* insufficiency under *Clewis*,[71] not *legal* insufficiency under *Jackson*.[72] It applied a different standard of review that we did away with in *Brooks*.[73] Second, in *Grotti*, there was considerably more testimony suggesting that the victim had died prior to the actions of the defendant.[74] While the issue in both *Grotti* and this case is the

---

[68] *See id.* at 899, 912.

[69] *See Gray v. Greer*, 800 F.2d 644, 646 (7th Cir.1986) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.").

[70] 273 S.W.3d 273 (Tex. Crim. App. 2008).

[71] *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996), *overruled by Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010).

[72] *Jackson v. Virginia*, 443 U.S. 307 (1979).

[73] 323 S.W.3d at 902.

[74] In *Grotti*, a sixty-four-year-old woman with metastatic ovarian cancer was brought into the hospital by her daughter complaining of a persistent cough. 273 S.W.3d at 754. After waiting two hours in the waiting room, the victim's daughter notified hospital staff that something was wrong with her mother. The EMT on staff noted that the victim "was unresponsive, did not have a detectable pulse, and showed no observable signs of life." *Id.* The doctors noticed that she had suffered a cardiac arrest. The woman's heart stopped beating for several minutes, then resumed, and then stopped again. This occurred several times. *Id.* at 754-55. The woman was reported as "dead"; however, her chest was rising and falling as if she were breathing. *Id.* at 756. It was Grotti's opinion that this "agonal breathing" was a result of the

same—whether the victim had died prior to the defendant's conduct—the two cases are factually distinct. In *Grotti*, it was uncontested that the deceased would have died had Dr. Grotti never acted: she had terminal cancer; her heart had stopped beating; she was not breathing. In the present case, there was no documented history of genetic disease, and no uncontested evidence that the fetuses would have self-aborted absent applicant's actions. Thus, for both legal and factual reasons, applicant's reliance on *Grotti* is misplaced.

In sum, applicant has failed to show that there is a reasonable probability that he would have prevailed if he had raised a sufficiency of evidence claim on appeal.[75] Therefore, applicant has failed to prove his entitlement to a new direct appeal based on his claim of ineffective assistance of appellate counsel.

---

victim being hyper-oxygenated, and what seemed to be breathing was actually muscle spasms. However, permission to remove the breathing tube was refused by the medical examiner. After determining that there were no "heart sounds or pulses," Grotti closed the oxygen tube to stop the "agonal breathing." *Id.* at 757. The issue at trial and on appeal was whether the woman was already medically dead before Dr. Grotti acted.

[75] The trial judge was mistaken in framing what applicant needed to show in order to prove prejudice. In his conclusions of law, the trial judge noted that

> The sufficiency of the evidence on the issue of causation of death of the fetuses was contested at trial to the extent that forgoing judicial review on appeal of the issue is of a serious nature to the extent that the reliability of the appellate decision in regard to the trial outcome is called into question.

The proper standard is whether "there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal." *Ex parte Miller*, 330 S.W.3d 610, 623 (Tex. Crim. App. 2009).

## IV.

In addition to the above ineffective-assistance claims, applicant raised several other claims in his petition.  Our remand order did not request further factual development of these claims, but the trial judge concluded that they were without merit. Based upon our independent review of the pertinent facts and applicable law, we agree with the trial judge that relief is not warranted on any of those additional claims.  Because applicant has not established any of his constitutional claims, we deny relief.

Delivered: December 5, 2012
Publish