

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. WR-75,804-02

### EX PARTE HANNAH RUTH OVERTON, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. 06-CR-3624-F IN THE 214TH DISTRICT COURT
### FROM NUECES COUNTY

MEYERS, J., delivered the opinion of the Court, in which PRICE, WOMACK, JOHNSON, HERVEY,  COCHRAN, ALCALA, JJ., joined. COCHRAN, J., filed a concurring opinion, in which JOHNSON and ALCALA, JJ., joined. KELLER, P.J., filed a dissenting opinion, in which KEASLER, J., joined.

### O P I N I O N

A jury convicted Applicant of capital murder for the death of a four-year-old child she and her husband were in the process of adopting. The trial court sentenced her to life imprisonment without parole. Her conviction and sentence were upheld by the court of appeals and we refused her petition for discretionary review. *Overton v. State*, No. 13-07-00735-CR, 2009 Tex. App. LEXIS 8312 (Tex. App.–Corpus Christi Oct. 29, 2009, pet. ref'd) (mem. op., not designated for publication); *In re Overton*, No. PD-1807-09, 2010

Tex. Crim. App. LEXIS 124 (Tex. Crim. App. Mar. 24, 2010). Applicant filed an article

11.07 application for writ of habeas corpus alleging that she is actually innocent based

upon newly discovered evidence, that she received ineffective assistance of counsel, and

that the State failed to turn over exculpatory evidence. We ordered the trial court to

conduct an evidentiary hearing for further factual development of Applicant's claims. *Ex

parte Overton*, No. WR-75,804-02, 2012 Tex. Crim. App. Unpub. LEXIS 85 (Tex. Crim.

App. Feb. 8, 2012). In response, the habeas judge conducted the hearing and entered

findings of facts and conclusions of law, ultimately recommending that relief be denied.

We ordered the application be filed and set for submission to determine whether:

> (1) Applicant received ineffective assistance of counsel at trial. Specifically, whether counsel were ineffective for failing to enter into evidence the deposition of Dr. Michael Moritz or to otherwise attempt to secure his availability to testify at Applicant's trial, and whether counsel provided conflicting advice regarding lesser included offense instructions being included in the jury charge. The parties shall also address whether Applicant was prejudiced by mis-communication among the defense team regarding the pre-trial investigation; and

> (2) The State failed to disclose exculpatory evidence in this case.

Because we conclude that Applicant did receive ineffective assistance of counsel, relief is

granted.

## BACKGROUND

In October 2006, Applicant and her husband brought the four-year-old boy they

were in the process of adopting, A.B., into an urgent care center. According to one of the

nurses present at the center, A.B. was not breathing and began to vomit excessively when

chest compressions were performed on him. The nurse testified that the vomit had the color and odor of chili, which is what Applicant had said she fed him before bringing him into the center. One of the doctors at the center testified that there was a huge amount of vomit and that they had to suction the contents from the child's mouth. Paramedics arrived and established an airway into the child, but he was not making any spontaneous movements. He was eventually taken across the street to Spohn South Hospital and then transferred to Driscoll Children's Hospital, where he died the next day.

Dr. Alexandre Rotta, the pediatric critical-care specialist at Driscoll who treated A.B., testified that when the child arrived from Spohn, he had to be connected to a ventilator and receive minutes of CPR before a pulse returned. A computer axial tomogram ("CAT") scan was ordered to observe the child's brain and it revealed that he had brain swelling as well as bleeding inside and around his brain. Dr. Rotta also ordered a second sample of A.B.'s blood to be tested when he learned of the Spohn blood test that showed the child's sodium level to be "incredibly high" at 242. Dr. Rotta explained that normal levels of sodium should be between 135 and 145. The second blood test showed the child's sodium level to be greater than 250, which was the highest Dr. Rotta had ever seen.

Dr. Rotta went on to testify about the symptoms an individual with sodium intoxication would experience. He stated that one would first feel general discomfort with the possibility of nausea and vomiting. Within thirty minutes, the patient would have

"pronounced thirst" and "try to seek water at any cost" because people cannot "tolerate having a high sodium without wanting to fix it." Following this would be more discomfort, changes in consciousness and behavior, difficulty breathing, loss of consciousness, seizures, and then cardiorespiratory arrest. Dr. Rotta stated that he thought the seizures and loss of consciousness would occur within one to one-and-a-half hours after the salt intoxication.

Although Dr. Rotta knew that A.B. had a "much greater chance of not surviving than surviving," they continued to try to resuscitate him. Dr. Rotta explained that when a child goes into cardiac arrest outside of the hospital, there is less than a ten-percent chance of survival and those who do survive have "significant neurological devastation." Dr. Rotta did conclude that the child could have survived if he had been taken to the hospital more quickly. Dr. Rotta also testified that he thought Applicant's description of the timeline was unusual and did not understand why she would take him to an urgent care clinic if he was in full arrest.

The medical examiner determined that A.B.'s death was a homicide, and Applicant was charged with capital murder. The indictment alleged that she caused the death of A.B. by giving him an acute toxic level of sodium or by failing to provide him with adequate or timely medical care.

At trial, Applicant testified that A.B. was "obsessed with eating" and ate more than her other children at every meal. She explained that he was having worsening problems

with eating off of the floor, getting into the trash, and even eating the cat food. She said that he would become upset whenever she prevented him from eating what he wanted, and that she had reported his excessive and inappropriate eating behaviors to the adoption supervisor.

On the day of the incident, Applicant testified that she fed the children breakfast when they woke up and then they went to bed to watch cartoons. Applicant said that she fell asleep at that point and when she awoke, A.B. was in the pantry on a stool, eating an unknown substance. She put him in timeout for three minutes and explained that they would go to eat when Larry, Applicant's husband, arrived home from work. A.B., however, upset over not getting food, threw a tantrum, defecated in his pants, and then threw his feces at Applicant. This behavior had occurred before, so Applicant gave him a wipe and helped him change his clothes. Upon getting everything cleaned up, however, A.B. did the same thing again, this time smearing his feces on the floor. Applicant eventually told him that she would give him something to eat, and fed him a leftover soup and chili mixture from the night before.

Larry Overton returned home while A.B. was eating and cleaned up the mess he had made. Applicant, Larry, A.B., and one of Applicant's children then went to Applicant's chiropractor appointment. On the way, they stopped at McDonald's to get food for Larry and Applicant; A.B. became upset when he was not allowed to get anything because he had already eaten. When they returned home from the appointment, Larry went

back to work and A.B. again went to the kitchen and complained he was hungry. After he began crying, Applicant decided to give him more chili with Zatarain's seasoning added to it. When she refused to give him a second serving, however, A.B. became extremely upset and threatened to defecate on her. She decided to give him a cup of water with "a couple of sprinkles of the Zatarain's" in it so that he would get the flavor she thought he wanted and calm down. She filled a full cup of water and then poured some out thinking it would be too much for the child. She then put the mixture in a sippy cup and A.B. drank it.

After finishing with the water, A.B. asked for more chili and began to throw a fit. He tantrumed for "20 minutes or so" when he suddenly stumbled to the floor, said he was cold, and threw up. Applicant simply "thought that he had gotten himself so worked up that he threw up." She called Larry and told him A.B. was "freaking out" and that he needed to come home. While waiting for Larry, Applicant and A.B. started to clean up the vomit when A.B. began to shake. He went to his bedroom and Applicant wrapped him in blankets and put a heating pad under him.

Larry returned home and Applicant consulted her EMT and nursing books and decided that A.B. might be "in some sort of shock," but she was not overly worried because that had happened before. However, in order to warm him further, Applicant and her husband placed him in a warm bath. At that point, she testified that A.B.'s breathing began to sound congested, so she used a nebulizer on him until his breathing got better. According to Applicant, when they took him out of the tub and dressed him, he was

moaning and "lethargic." Although Applicant determined that his vital signs were normal, she began to think there was something more seriously wrong with him when the abnormal breathing returned. As he became less responsive, Applicant sensed the situation had become "serious." She had not realized this sooner, she said, because his behavior had been similar to her youngest son's when he had pneumonia a few months prior and to her other children when they had the flu.

At this point, Larry and Applicant drove A.B. to the urgent care center. On the way, Applicant called the adoption coordinator for the necessary forms for him to see the doctor. She told the coordinator that the child had "funny" breathing and was not "responding well." During the ride, however, A.B. stopped breathing altogether and Applicant began CPR. She stated that he vomited into her mouth and then began breathing again. However, as they were taking him out of the car in the parking lot of the urgent care center, he stopped breathing again. They took him inside the center, which eventually transferred him to Spohn, which then transferred him to Driscoll Children's Hospital where he died the next day.

The jury convicted Applicant of capital murder and the trial court sentenced her to life imprisonment. A jury poll was conducted and each juror stated that he or she found Applicant guilty based on her failure to obtain medical care for A.B., rather than on the theory that she forced the child to consume the sodium. On direct appeal, Applicant challenged the sufficiency of the evidence; claimed there was error in the indictment and

jury charge; alleged that the State withheld material exculpatory evidence and presented "extra-record" evidence to the jury; asserted that there was newly discovered evidence; alleged that there was prosecutorial misconduct; and claimed that the trial court abused its discretion in allowing testimony from the State's expert witnesses. *Overton*, 2009 Tex. App. LEXIS 8312, at *1. The court of appeals overruled all of Applicant's issues and affirmed the judgment of the trial court. *Id*. at *159-60. We then refused Applicant's petition of discretionary review and she filed this application for writ of habeas corpus.

## DR. MORITZ

Dr. Michael Moritz is a leading expert on hypernatremia, or sodium intoxication, and has written extensively on the subject. He was hired by Applicant's defense team and gave a deposition, but that deposition was never entered into evidence at Applicant's trial and he did not otherwise testify. Applicant now claims that the defense team's failure to present his testimony or deposition constitutes ineffective assistance of counsel.

### *His Testimony*

Dr. Moritz's deposition was conducted during the middle of the criminal trial by Brad Condit, the Overtons' civil lawyer in the child-custody case.[1] Only two of Applicant's criminal-defense attorneys, David Stith and Chris Pinedo, either attended or watched a portion of the deposition, neither seeing the entire thing. Pinedo, however, recommended to John Gilmore, the lead trial counsel, that the deposition not be used. At

---

[1]As a result of A.B.'s death, Applicant's other children were removed and custody proceedings initiated.

the habeas hearing, Pinedo testified that he did this because the deposition contained objectionable material and was too "messed up" to be edited and played for the jury. He believed that interruptions and invalid objections made by the prosecution during the deposition rendered it "useless," and he asserted that "cutting and pasting a deposition can be very difficult with a lot of needless interruptions." He also explained that, although they originally planned to call Dr. Moritz live at trial, it was postponed twice. Rather than ask the Court for a continuance to accommodate the doctor, who could not travel on the Sabbath, the deposition was conducted by Brad Condit in the middle of the criminal trial so that the doctor could return home.

Dr. Moritz's deposition was about two hours in length and contained much testimony that was favorable to the defense. It began with a lengthy history of his work, his research, and his published papers on the subject of hypernatremia. He then went on to describe, in detail, emotional deprivation syndrome, which is often associated with extreme eating habits and explained how many of its features were present in A.B. He refuted much of what Dr. Rotta testified to, such as the amount of Zatarain's A.B. would have had to ingest for his sodium to be at the level it was, and determined that Dr. Rotta did not evaluate the cause of A.B.'s hypernatremia at all, a significant oversight. He described the difficulty Applicant would have had in forcing that amount of salt or Zatarain's into A.B., who would have fought back, spit it out, or vomited, but asserted that if A.B. had a psychological problem, such as emotional deprivation syndrome, he could

have consumed it voluntarily. Dr. Moritz also ultimately concluded that Applicant did not poison the child and that A.B. consuming something himself was the most likely cause of his sodium intoxication.

Dr. Moritz did make some statements in the deposition that were helpful to the State's case. He discussed a case in which an infant had a sodium level of 274, higher than A.B.'s, and did recover. He admitted that the only information he received regarding the possibility of child abuse by Applicant was given to him by the defense. He also stated that the mortality rate of a person in A.B.'s situation would be "a minimum of a thirty to fifty percent," which could be considered favorable to the State's case.

However, Dr. Moritz also specifically testified about the issue of Applicant's omission in not getting A.B. medical care sooner. The following includes that pertinent testimony:

Q: [By Brad Condit] Doctor, are you a father yourself?

A: [By Dr. Moritz] I am.

Q: How many children do you have?

A: I have six.

Q: Based on your life experience, your training, your research, your experience as a doctor, what would be the window of opportunity, assuming that [A.B.] consumed the amount of sodium you have calculated, in an acute period of time, for the parents to have sought treatment that would have resulted in a recovery?

Sandra Eastwood, for the State: Objection. Calls for the ultimate finding by the factfinder. "Being a father himself" is not a reason to

be commenting on this. If from a medical perspective he can define the window of opportunity, the State does not object. But as to him being a father, I would object to that.

Q: Take out the fact that you have experience as a father. Please answer the question.

A: [By Dr. Moritz] On a medical basis, what we know from the literature, animals, humans, case studies, we know that salt poisoning and acute hypernatremia, meaning sodium levels that goes very rapid, goes high very rapidly, is lethal. That's what we know. And regardless of what treatment is offered, we know that the mortality, the death rate, of sodiums in this range are very high. Many cases of sodiums this high have actually happened in the hospital under physicians' supervision or in the emergency room where they gave salt as an emetic in the emergency room. And many times, even though therapy is introduced, there is no guarantee that a person could survive that. Now when it happens in the field, and we're talking about a sodium level-

Q: Field. You mean in a home?

A: Yeah, in the home. You're talking about a sodium level that is clearly amongst the highest ever reported in a child of that age-the 274 we have is an infant-of a child of that age, and understanding that there is going to be a period of time, just a physical period of time, for the child to get from the home to the hospital. Give it whatever, a half of an hour, forty minutes. If the child has the acute sodium ingestion, it will take at least an hour for the child to manifest significant amount of symptoms for the patient to say 'Wow, I think this child is deathly ill and needs to go to the hospital.' This is very different-

> Sandra Eastwood: Objection. That's a psychological conclusion. It is up to the jury with what point a parent should say 'Wow, I need to go to the hospital.'

A: Well, for example, most of the times if someone would bring someone to the emerg- you know call 9-1-1 and bring them to the emergency room, it would be for something like the child can't breathe-

> Sandra Eastwood: Objection. He's not qualified himself as being

familiar with ER procedures.

A: This would be just examples. Just examples. Uh, the child can't breathe, the child turned blue, the child passed out. Or bleeding, the child cut themselves and is bleeding. These are things where someone would say, 'Wow, I need to bring someone to the emergency room.' But when you have something like vomiting, confusion, lethargy, meaning sleepy, not acting right, these are things that are more subtle. And for a parent who doesn't know what salt poisoning is, has never seen it before, it would take a period of time for them to figure out what's going on out of the blue when someone poisons themselves, and you don't know that they've poisoned themselves, it takes a while to figure out what is going on. And if it took an hour, then whatever, a half an hour to get to the hospital, and then blood needs to be taken, and it takes usually anywhere between 45 and 75 minutes to get a sodium level back from the lab. And when you would get a sodium value of 245, which would be the highest ever reported, you would want to repeat that value. And you're talking another hour to get that back. There's going to be a minimum three or four hours, under the best circumstances, before you can address it, then most people, including myself, have, in fact, never managed someone with a sodium of 245. And there's limited things that you have at your disposal to treat that then what we call good supportive care: maintaining the blood pressure, giving the fluids, and hoping that things work out. But there's no quote unquote specific therapy. And I'm someone whose published on using dialysis for this situation and I've used dialysis for this situation. It's not clear what you do. And I've published on how to, it's not clear what you have at your disposal and if someone lives or if someone dies, to a large degree, it's luck. There's no way you could predict, no one could say that 'I could treat this and guarantee survival,' with this situation. The mortality is very high. A minimum of a thirty to fifty percent mortality with someone who has a sodium of that, that high. And that's what the animal data shows. With sodium values in the 200s...

Sandra Eastwood: Objection. Narrative.

Dr. Moritz's opinion remained the same after trial, as evidenced by this testimony at the habeas hearing:

Q: [By Mr. Raley, for the Applicant] All right. Back to our question about if

she'd called 9-1-1 and the ambulance had come as quickly as they could, took him to the hospital as quickly as they could, triaged, decided to do labs at some point. Lab results came back; lab results had to be repeated. Do you have an opinion based on reasonable medical certainty and your education, your experience in this field as someone who has studied dozens of hypernatremia cases even since the trial of this case, do you have an opinion whether or not with a sodium level of 245 he could have saved even in the best of care, even if that 9-1-1 call had been made immediately, the ambulance had come immediately, and they'd taken him in and gave him the very, very best of care? With a blood sodium level of 245, do you have an opinion as to whether it is more likely than not that he still would have died no matter what?

> Mr. Norman, for the State: I would object as speculative, Your Honor.

> The Court: Overruled.

Q: You can answer.

A: I would say it would be exceedingly unlikely for him to live; and if he did, in all probability or almost certainly there would be irreversible neurological injury.

### *Ineffective Assistance of Counsel*

In order for us to grant habeas corpus relief for ineffective assistance of counsel, an applicant must establish, by a preponderance of the evidence, that: (1) trial counsel's performance fell "below an objective standard of reasonableness", and (2) there was a reasonable probability that the result of the proceedings would have been different but for trial counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

There is a strong presumption that counsel's conduct was reasonable and judicial

scrutiny of it will be highly deferential. *Ex parte Flores*, 387 S.W.3d 626, 636 (Tex. Crim. App. 2012); *Ex parte Rogers*, 369 S.W.3d 858, 862 (Tex. Crim. App. 2012). In fact, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. However, where counsel's deficient conduct is sufficient to undermine confidence in the outcome of the proceeding, "reasonable probability" that the result would have been different exists. *Id*. at 694. The *Strickland* test is judged by the viewpoint of counsel at the time he acted, rather than through hindsight. *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012).

At the habeas hearing, Applicant's trial attorneys testified. David Jones, one of the attorneys who was supposed to advise the team on medical issues, testified that he did not view Dr. Moritz's deposition and that the decision to not use him during the trial was "completely ineffective." He thought Dr. Moritz's testimony would have been "extremely valuable for the jury," as "he rebutted everything that Rotta said," and would have "firmly convinced [the jury] of Hannah's innocence." John Gilmore, the senior criminal lawyer on Applicant's defense team, testified that he also did not review the tape of Moritz's deposition himself and that he agreed with Mr. Jones's testimony about their ineffectiveness.

The decision to not present Dr. Moritz's testimony to the jury does not appear to be the result of any thoroughly investigated trial strategy and was not a reasonable decision

by Applicant's defense attorneys. Chris Pinedo described the choice not to present it as a product of the difficultly in editing around the prosecution's improper comments, not as a strategic decision by the Applicant's defense team. Further, there was no strategy described in not requesting a continuance to accommodate Dr. Moritz's travel restrictions. It is clear from the habeas hearing and deposition itself that Dr. Moritz's testimony would have directly supported Applicant's defense and refuted much of the State's evidence. Pinedo even states in an affidavit that "Dr. Moritz's testimony was essential to prove that [A.B.] would not have survived from the sodium poisoning he suffered. Even if he had ingested the sodium at a hospital, it is highly unlikely he would have survived." Given the pertinence of that testimony, and no convincing strategy or reason to keep it from the jury, it was objectively unreasonable for Applicant's counsel to not attempt to present it.

With the first prong of the *Strickland* test established, we now consider whether there is a reasonable probability that counsel's performance affected the result of the trial. Dr. Moritz was an extremely well-qualified expert on salt intoxication, as evidenced by the discussion during his testimony about his career path, research, and published papers. In his deposition, he was knowledgeable and able to explain complicated medical concepts with ease. During his testimony, he not only refuted much of what Dr. Rotta testified to for the State, but also established that he was better informed on the subject of salt intoxication than Dr. Rotta. Further, Dr. Moritz testified that A.B's survival,

regardless of when he was brought to the hospital, would have been determined largely by luck. He described the mortality rate with salt intoxication as very high and said that it was extremely unlikely that A.B. would have lived, irrespective of how quickly medical care was given. Because the jury convicted Applicant based on a theory of failing to provide A.B. with adequate or timely medical care, this testimony goes directly to the verdict rendered in her trial.

We believe that Dr. Moritz's credibility combined with his testimony would have had a strong impact on the jury and sufficiently undermines the outcome of the trial. But for the defense team's failure to present Dr. Moritz's testimony to the jury in some way, there is a reasonable probability that the outcome of Appellant's trial would have been different. Both prongs of the *Strickland* test have been established.

## CONCLUSION

Applicant has met her burden in satisfying both prongs of the *Strickland* test and established that she received ineffective assistance of counsel. Because defense counsel's performance fell below a reasonable standard and there is a reasonable probability that the outcome of Applicant's trial would have been different but for that performance, we grant relief. Because we are granting relief on Applicant's first claim of ineffective assistance of counsel, there is no need for us to address the second issue of whether the State failed to disclose exculpatory evidence. We reverse Applicant's conviction and remand her case to the trial court for a new trial.

Filed: September 17, 2014

Publish