COURT OF CRIMINAL APPEALS WRIT #: WR-82,778-01
TARRANT COUNTY, TX, WRIT NO. C-396-010272-1152016-A

82,778-01

RECEIVED IN
COURT OF CRIMINAL APPEALS

EX PARTE                          §
                                  §
                                  §   IN THE COURT OF CRIMINAL AP-
                                  §   PEALS OF TEXAS, IN AUSTIN, TX
                                  §
DESMOND LEDET                     §

FEB 13 2015

Abel Acosta, Clerk

**OBJECTION #3: THE TRIAL COURT'S ADOPTED FACT FINDINGS AND LEGAL CONCLUSIONS PRESENTED TO THIS COURT, REGARDING GROUND #26, ARE COMPLETELY INCORRECT, AND IN <u>EXTREME</u> CONFLICT WITH THE REPORTER- 'S RECORD**

**TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:**

The Applicant, Desmond Ledet, humbly and respectfully presents

this **OBJECTION** as stated above in the heading, to this Honorable

Court. Placed in Prison Mailbox on Feb.6, 2015 at 11:30 AM. It

should leave on Monday. Mailroom closed on weekends. **There are**

**extreme and gross conflicts with the record involving the major-**

**ity of the trial court's adopted fact findings and legal conclu-**

**sions.** In support of this particular objection, the Applicant

presents:

1: The trial court's adoption of the State's finding that: "Hon. Fortinberry did not object to the State's closing argument because it was within the scope of the evidence presented" **is not supported by the record.** See "State's Proposed...Findings...Conclusions" at p.7, ¶31, & ¶32.

2: **Nothing in the record,** and the State has presented **NOTHING** in the findings adopted by the trial court, not even a modicum of evidence, that can reasonably be construed as evi- the Applicant **"knew the place"**[Fort Worth]**"like the back of his hand BECAUSE he drives it. He drives it. Looking for people. Looking for vulnerable people. Looking for people he can do what he wants to do with. The man's a predator."**

3: The trial court's adopted findings present **NOTHING** from the reporter's record(and nothing exist) to support it's imaginative assertion(not even a modicum of evidence) that the Applicant gained knowledge of the area("knew the place like the back of his hand") **"B E C A U S E"** he had learned the area by, and was responsible for, habitually committing illegal predatory acts of driving around "Looking for people ...vulnerable people...to do what he wants to do with."

p.1 of 11                    (p.11 & 12 are
                             exhibits from the
                             Reporter's Record)

4: The trial court's adopted findings and legal conclusions based on them are not credible in light of the record.

5: The mere claim that the argument in question in Ground # 26 is within the scope of the evidence, with nothing more to support such a false claim, is insufficient to support a conclusion, in and of itself, that the complained of argument was "within the scope of the evidence." See State's Proposed...Findings...Conclusions" at p.7, ¶31, & ¶32.

6: The State's findings falsely claim that the argument was within one of the well recognized 4 areas of permissible argument. Alejandro v. State, 493 S.W. 2d 230(Tex.Crim.App .1973). Specifically a summation of the evidence. See the trial court's adopted **legal conclusions for Ground #** **26**---"State's Proposed...Findings...Conclusions" at p.15, ¶16, & ¶17.

7: Because the specific argument complained of in Ground #26 was not a summation of the evidence, and defense counsel never once alleged in his affidavit that his failure to object to it was the product of a reasonable trial strategy, instead he sidestepped the issue raised, **the trial court's adopted legal conclusion that asserts Hon. Fortinberry's failure to object was a "trial strategy" is incorrect.** See "State's Proposed...Findings...Conclusions" at p.15, ¶17; & Fortinberry affidavit at p.3(response to Ground #26)

8: Hon. Fortinberry simply artfully sidestepped the part of the Reporter's Record cited by the Applicant in Ground #26 ("Knew the place like the back of his hand **BECAUSE he drives it...LOOKING FOR PEOPLE. LOOKING FOR VULNERABLE PEOPLE. LOOKING FOR PEOPLE HE CAN DO WHAT HE WANTS TO DO WITH.")** N O T I C E Hon. Fortiberry never attempts to even engage in offering an explaination or strategy for not objecting to the real issue raised in the Application. Id

9: N O T I C E---Hon. Fortinberry never even attepts to assert that the argument that the Applicant knew the area **BECAUSE he drives it habitually hunting for vulnerable people to assault** was a reasonable summation of the evidence. Because there is **NOTHING AT ALL** in the record to support that extremely prejudicial argument. **Id.**

10: To avoid explaining why he failed to object to the argument the Applicant learned the area because he **drives it looking for vulnerable people to assault habitually,** Hon. Fortinberry simply artfully concluded. "...The fact that he went to a location and did have undetected sex indicates he knew where he was going. This is not outside the scope of the evidence." Fortinberry affidavit at p.3. **FORTINBERRY'S AFFIDAVIT FAILS TO ADDRESS THE ISSUE RAIS-**

ED.

11: The problem with Hon. Fortinberry's affidavit response to Ground #26 is it never ever addresses the error/issue the Applicant raises as being outside of the record in Ground #26. Compare Fortinberry affidavit(Ground #26), with Applicant's complaint that the State's closing argument that he habitualy drove around Fort Worth looking for vulnerable people to assault. See Application, p. 14 U - 15 U. (Ground #26).

12: Ground #26 is **not** a Ground in which the Applicant complained that some argument by the State alleging **"he knew where he was going" or "knew the neighborhood"**, was outside the record. That is total misconstruement of Applicant's argument: **THAT THE STATE TELLING THE JURY THAT APPLICANT** "knew the place like the back of his hand **BECAUSE HE DRIVES IT. HE DRIVES IT LOOKING FOR PEOPLE. LOOKING FOR VULNERABLE PEOPLE. LOOKING FOR PEOPLE HE CAN DO WHAT HE WANTS TO DO WITH, WAS OUTSIDE THE RECORD.**

13: 3 times in the argument outside the record the State emphasizes that Applicant drives around **"LOOKING"** for (1) "people"; (2) "vulnerable people"; & (3) "people he can do what he wants to do with."

a) "Looking" implies that there was evidence in the record that Applicant habitually drives around Fort Worth using his eyes making a visual or mental search for:

b) "People">>>>"People" is defined as: 1(usu. as plural) a: **persons** composing of a community, tribe,race, nation, etc.(the American people; a warlike people). b: a **group of persons** of a usu. specified kind...(Oxford Pocket American Dictionary of Current English).

c) The State specified "vulnerable people". Which implies, **not only,** that there was evidence in the record the Applicant hunted for groups of people compossing of the community, but specifically vulnerable members of that community. "Vulnerable" is defined as : 1. **that may be wounded or harmed.** 2. (foll. by to) **exposed to damage by weapon, criticism, etc.**(Oxford Pocket American Dictionary of Current English).

b) The State further asserted that, not only was the Applicant habitually driving around looking for multiple persons in the community that may be wounded or harmed, but also that he could do whatever he wanted to do with. Surely the jury imagined rape, amongst other things, in this trial for Agg. Sex. Assault.

14: None of the above evidence cited herein in ¶13(a),(b), (c), or (d) is found anywhere at all in the entire reporter's record.

    a) The State presented no evidence during Applicant's trial, nor was any offered by the defense, not testimonial, physical, or in any form whatsoever that could support a finding that any of the complained of argument was within the scope of evidence presented at trial.

    b) No one testified that the Applicant had been seen or even suspected of hunting for groups of people, or persons in the community who were vulnerable to do anything to at all.

15: Because no such evidence exist in the record, it is clear why Hon. Fortinberry, who's affidavit is now under review by the State Bar's Office of Chief Disciplinary Counsel for presenting false material facts to the habeas trial court, refused in his affidavit, to approach the real issue raised in Ground #26. There was no post hoc strategy to fabricate, since the argument is entirely outside of the record.

16: It is equally clear why although the State's proposed findings and legal conclusions falsely allege that the argument complained of was a summation of the evidence, **IT ENTIRELY FAILS TO POINT THIS COURT TO ANY EVIDENCE IN THE RECORD, THAT SUPPORTS THE IMPROPER ARGUMENT, WAS A SUMMATION OF THE EVIDENCE PRESENTED AT TRIAL. IT WAS NOT.**

17: The trial Court has made a severe mistake, once again, adopting the State's proposed findings and legal conclusions, and then presenting to this Court of Criminal Appeals as if they were correct. See <u>Ex parte Reed</u>, 271 S.W. 3d 698, 729(Tex.Crim.App.2008)("the trial court as a neutral arbiter **should have more carefully scrutinized the State's proposed findings to ensure that they accurately reflect the evidence in the record** before adopting them verbatim.").

18: The trial court has made this mistake repeatedly within the court's adoption of these findings on every Ground. More objection follow this one on other Grounds.

19: On p.15 <u>U</u> of the Application the Applicant has already explained that: "The argument was factually opposite the record. The alleged victim testified that she had never seen the Applicant in her neighborhood and that her and the Applicant were complete strangers to eachother. **v.5 RR, p.17, lines 15-18.** Her testimony shows she smoked

crack and hung out in the hood. **She had never** seen the Applicant **around before.**"

Because the trial court's adopted findings misrepresent the Reporter's Record to this Court of Criminal Appeals, the Applicant, further directs this Court to **v.5 RR, p. 53, line 22-p.57, line 11.** In which the alleged victim, who testifed she had never seen Applicant before at v.5 RR, p.17, lines 15-18, **claims that she did see him Again "approxiamately a month"** after she alleged he assaulted her. See a copy of the above said pages of the Reporter's Record, attached to this objection on p.**10** -p.**11** .

This time she alleges that the Applicant pulled up in a car with some lady. The Applicant got out and asked a male friend that she was standing with in the front yard of a house **"if we wanted to buy a watch."** v.5 RR, p. 55. line 22-23.

The prosecutor then asked the alleged victim: **"He just get's out of the car and says, hey, you want to buy a watch?"** v.R, RR, p.55, line 24-25.

The alleged victim responds: **"Yeah"** v.5 RR, p.56 line 1.

The prosecutor goes on to ask a question about the woman she alleges pulled up in the car with Applicant. She asked the alleged victim: **"Do you remember anything about the woman?"** v.5 RR, p.56, line 12.

The alleged victim replies: **"She was dark skinned, not real dark, Little lighter than me."** Id at line 13-14.

The alleged victim even goes so far to allege that while the Applicant was trying to sell his watch to her and her male friend that she asked the Applicant: **"Do you remember me?"** Id at line 17. The State then asked: **"What did he say?"** Id at line 18.

The alleged victim replies: **"He looked. So I was, like, he actually don't remember me, you know. So at that time HE WAS JUST DETERMINED TO SELL HIS WATCH."** Id at lines.

a) allegations that the Applicant wanted to sell a watch in the community is not evidence that supports a conclusion the Applicant habitually drives around looking for vulnerable people to assault.

b) The alleged victim does not assert that he was trying to pick up a vulnerable person, only that: **"So at that time he was just determined to sell his watch."**

29: Had the State argued: "He knows the place like the back of his hand because him and a female friend of his drives it **SELLING WATCHES IN THE NEIGHBORHOOD TO MEMBERS OF THE COMMUNITY"**, that would have been a reasonable summation of the evidence presented whether or not the alleged victim actually saw the Applicant selling watches or not "approxiamately a month" after she alleged he assaulted her.

30: But arguing that: "He knew the place like the back of his hand **BECAUSE HE DRIVES IT. HE DRIVES IT. LOOKING FOR PEOPLE. LOOKING FOR VULNERABLE PEOPLE. LOOKING FOR PEOPLE HE CAN DO WHAT HE WANTS TO DO WITH."** is not a reasonable deduction of the evidence, and amounts to unsworn testimony.

31: An independant search of the record will reveal **NOTHING** to establish that the argument outside of the record was within the scope of the evidence. The Applicant has already pointed this Court to all the places in the record that have anything to do with the Applicant being in the neighborhood.

32: Had there actually been anything in the record to support a finding that the complained of argument was a summation of the evidence, **the State would have pointed it out, and defense counsel would have not artfully avoided the issue in his affidavit.**

33: The prejudice prong of <u>Strickland</u> is definately met in this case, as the unsworn testimony, outside of the record violated due process and denied the Applicant a fair trial based on legitimate evidence that was presented at trial, that was subjected to the crucible of meaningful adversarial testing.

34: <u>Strickland</u> has made it clear that the ultimate focus **in a prejudice inquiry** of a claim of ineffectiveness is the fundamental fairness of the trial. <u>Strickland v. Washington</u>, 466 U.S. 668, 696(1984).

35: The Applicant objects to the State's legal conclusion in this matter as being incorrect. See State's Proposed... Findings...Conclusions" at p.17, ¶28.

36: The Applicant objects to the adopted recommendation that relief be denied for his Ground #26.

37: The improper argument in this case is akin to the improper argument in **Melton v. State,** 713 S.W. 2d 107 (Tex. Crim.App.1986)

38: In <u>Melton</u>, 713 S.W. 2d at 114, this Court explained that:

"During the prosecutor's closing argument...he argued the following: 'People you do understand the quantity of what were dealing with here today? Do you understand there is over three hundred Case backhoes out there missing, 580's'"

39: In response to that argument...counsel "immediately objected on the basis **that there was no evidence produced which connected the defendants to any other equipment than what was alleged in the imdictment.**" Id.

40: The very title of Applicant's Ground #26 is: "THERE IS NO EVIDENCE IN THE RECORD CONNECTING THE APPLICANT TO HABITUALLY DRIVING AROUND IN A PREDATORY MANNER 'LOOKING FOR VULNERABLE PEOPLE' TO SEXUALLY ASSAULT('DO WHAT HE WANTS TO DO WITH') **INDICTMENT ALLEGED ONE OFFENSE AGAINST ONE PERSON;** COUNSEL WAS INEFFECTIVE...FOR NOT OBJECTING TO...ARGUMENT, <u>OUTSIDE OF THE RECORD</u>, THAT INFECTED THE TRIALS FAIRNESS...PERSUADING THE JURY APPLICANT WAS RESPONSIBLE FOR SUCH EXTRANEOUS ILLEGAL ACTIVITY AND TO CONVICT HIM ON THAT BASIS(At v.6 RR, p.18 lines 14-17).

41: In <u>Melton</u> at Id, the trial court sustained the "objection and ordered the jury to disregard the prosecutor's previous statement." The trial court overruled a motion for a mistrial.

42: This honorable Court of Criminal Appeals went on to hold , while reversing <u>Melton</u> and his codefendant's conviction: **"Clearly the prosecutor in the instant case was trying to persuade the jury that these defendants were responsible for more than just the one offense alleged in the instant indictment and to convict them on that basis. Such argument was totally outside the record and impermissible."** <u>Melton</u>, 713 S.W. 2d at 114.

43: This Court concluded that the improper remark in <u>Melton</u> was so highly prejudicial and inflamatory that the trial courts instruction to the jury to disregard was insufficient to cure the error. Id

44: This Court concluded: **"The prosecutor's tactic of imputing to the defendants the responsibility for the theft of 300 other peices of heavy equipment was so prejudicial that we have no other alternative but to reverse the appellants' conviction."** Id.

45: There is no difference between Applicant's case and <u>Meltons</u>, aside from the fact counsel objected to the impro-

per argument in <u>Melton</u>(Applicant's lawyer did not); and the crime the prosecutor in <u>Melton</u>,argued outside the record <u>Melton</u> **and codefendant were responsible for**,was stealing hundreds of backhoes(while in Applicant's it was **DRIVING AROUND HUNTING FOR MULTIPLE PERSONS WHO WERE VULNERABLE IN THE COMMUNITY TO HARM AND ASSAULT SEXUAL-LY). FAR MORE INFLAMATORY THAN BEING FALSELY ACCUSED OF STEALING BACKHOES.**

There was no overwhelming evidence of guilt in this trial.

The entire trial the State alleged that the Applicant forced the complainant to submit to nonconsensual sex,by pointing a gun at her. She even testified that she felt funny and begin to exit his vehicle, but he pulled a gun pointed it at her,and commanded her to get back in. Her testimony is that because the alleged gun was pointed at her,she obeyed the Applicant, got back in the vehicle, and submitted to nonconsensual sex under the threat of being killed with the alleged weapon.

The **jury entirely rejected the complainants story that she was held at gun point,and submitted to sexual assault, and reentered the Applicant's vehicle,under gun point.** Even the State's incorrect and uncredible findings adopted by the trial court admit/concede that. See State's Proposed...Findings...Conclusions, at p.3, ¶2.

So why was Applicant convicted? What led a jury,who rejected the alleged victims own testimony,that she was on her way out of Applicant's parked vehicle until he pulled a gun,and commanded her to get back in at gun point, return a guilty verdict? What would cause a jury who did not believe, and rejected, the complainants testimony that she submitted to nonconsensual sex under the threat of being killed with a gun,she alleged Applicant was pointing at her,to return a guilty verdict?

Surely it was not her testimony. They rejected it.

It was the unsworn testimony outside of the record.

Besides the fact the misconduct denied Applicant a fair trial **THERE DOES EXIST A HIGH PROBABILITY THE OUCOME OF APPLICANT'S TRIAL WOULD HAVE BEEN DIFFERENT HAD DEFENSE COUNSEL OBJECTED, SOUGHT CURRATIVE INSTRUCTIONS, AND EVEN MOVED FOR A MISTRIAL.**

**PRAYER**

The Applicant, Desmond Ledet, humbly and respectfully prays that this honorable Court will acknowledge this objection; reject the trial court's erroneous, inaccurate findings and legal conclusions concerning his Grounds #26 **because they are not supported by the record; and instead enter appropriate findings and legal conclusions that the record and law does support.** Ex parte Flores, 387 S.W. 3d 626, 635(Tex.Crim.App.2012)(holding that the findings of a habeas trial judge "are generally accorded great deference, **but when the findings are not supported by the record , ...the rationale for this deference disappears")("...we will enter alternative or contrary findings that the record supports"**))

Ultimately the Applicant prays that this honorable Court wi-grant him immediate habeas corpus relief. THANKYOU.

Respectfully Submitted,

DESMOND LEDET   #01651095
Telford Unit
3899 State Hwy.98
New Boston, TX   75570

## CERTIFICATE OF SERVICE

A true copy of the above has been mailed to the Tarrant County, TX. Criminal District Attorney's Office located at 401 W. Belknap, Fort Worth, Texas  76196-0201. Put in Prison mailbox on FRiday, Feb.6th, 2015.  Will probaly not leave until following Mon. Mail does not move in Texas prisons on weekends

OR,TUE.

DESMOND LEDET.

Page 50

Q. Now, do you remember the pictures that the State showed earlier of the seats and the front carriage of the truck?

MS. GILLAND: May I approach, Your Honor?

THE COURT: Yes.

Q. (BY MS. GILLAND) All right. So right here, you were right in this passenger seat?

A. Yes, I was.

Q. And you told the State this is about what the inside of the car looked like, correct?

A. Uh-huh. It was gray.

Q. All right. And you can see in the picture that there's not a whole lot of space in this truck in the front?

A. I said that.

Q. That would be a yes?

A. Yes.

Q. Ms. Lee, how tall are you?

A. I'm 5'7".

Q. But you told the prosecutor and you told the police that you thought that the Defendant, the man who raped you was taller than you?

A. I thought -- I don't know exactly by him sitting in the car. He never --

Q. That would be a yes or no.

Page 51

A. No.

Q. All right. So you told us he picked you up at roughly 11:00 to 12:00, somewhere in there. Yes?

A. Yes.

Q. So approximately how long did it take to get to Handley?

A. I wasn't counting on -- I wasn't even counting no time. I don't know.

Q. Ten minutes? Thirty minutes? Two hours?

MS. McCORMICK: Your Honor, I'm going to object. She already said she doesn't know.

THE COURT: Okay. I'll sustain the objection.

Q. (BY MS. GILLAND) Ms. Lee, do you remember what time it was when the police picked you up at McDonald's?

A. No. I do not have a watch.

MS. GILLAND: No further questions, Your Honor.

REDIRECT EXAMINATION

BY MS. McCORMICK:

Q. Melvinna, if the testimony has been that the officers got the 9-1-1 call about 2:30, 2:45, how long before that would it have been that he picked you up at the store?

A. Approximately -- maybe two hours.

Page 52

Q. Do you have a watch?

A. No.

Q. Were you wearing one that night?

A. No, I was not.

Q. Did you have a reason to watch the clock?

A. No.

Q. Do you even have any idea really what time you left Lola's house?

A. No.

Q. So all of this stuff about time, how long, would that be fair to say that that's just kind of a guess on your part?

A. Yes.

Q. Now, the defense counsel asked you about whether you were pregnant and drinking, and you were doing crack and you took a ride from a stranger?

A. (Moving head up and down).

Q. You're not here to make any excuses for that, are you?

A. No.

Q. Does that mean you got what you deserved?

A. No.

Q. Is what Desmond Ledet did to you still wrong?

A. Yes.

Q. Now, you were also asked about some statements

Page 53

that you made. What was your -- you started to answer and another question was asked. You started to answer when something like that happens, your mind is kind of -- what were you like that night when the police got there?

A. I was like -- I was like, you know, just in shock.

Q. Okay. Were you thinking clearly?

A. It's like everything just happened all so fast, you know.

Q. And then when Detective O'Brien came out to talk to you in March of '09, it had been five years, correct?

A. Yes.

Q. Now, in your interview with Detective O'Brien you didn't mention that you were wearing a dress either, did you? Does that mean you were naked or --

MS. GILLAND: Leading, Your Honor.

THE COURT: Sustained.

MS. McCORMICK: No further questions at this time.

RECROSS-EXAMINATION

BY MS. GILLAND:

Q. Ms. Lee, did you tell Detective Ryan -- O'Brien that you saw Desmond one, two months after the rape occurred?

A. No. It wasn't no one or two months. I said it

Page 54

was probably approximately a month.

Q. And that would be one to two months?

A. Okay. Well.

Q. And you were with a friend when you saw him?

A. I was at a friend's house.

Q. You were with a friend at the time you saw him, yes?

A. Yes.

Q. And when you saw him, you didn't tell your friend, this is the man that raped me, did you?

A. Afterwards, yes.

Q. Is that what you told Detective O'Brien?

A. I don't remember what I told him, not on that part there.

Q. Yes or no?

A. No.

MS. McCORMICK: Your Honor, I'm going to object. She's answered the question.

THE COURT: She did say I don't remember.

Q. (BY MS. GILLAND) Now, you didn't call the police, did you?

A. I wasn't by a phone.

Q. So that's no?

A. No.

Q. You never at any time -- I mean, I understand --

Page 55

I understand you're saying that there wasn't a phone immediately there. But you didn't -- the next opportunity you had a phone available you didn't call the police?

A. What difference would it made, he was gone. I mean, he was already gone. I mean, for me to call and say I --

MS. GILLAND: Objection, nonresponsive.

THE COURT: Sustained.

MS. GILLAND: No further questions, Your Honor.

MS. McCORMICK: I have a few more questions.

FURTHER REDIRECT EXAMINATION
BY MS. McCORMICK:

Q. Now, the occasion that you saw him after the rape, what was Desmond Ledet trying to do?

A. Sell a watch.

Q. Where were you?

A. I was standing in the front yard.

Q. Of where?

A. On Berry at my friend's house. I was talking to him at the time when him and some lady pulled up in a car, and he got out to ask him if we wanted to buy a watch.

Q. He just gets out of the car and says, hey, you want to buy a watch?

Page 56

A. Yeah.

Q. Do you remember anything about the car that he was in?

A. If I'm not mistaken, it was a brown car. I don't know what model, but it was -- it wasn't up to date. It was old.

Q. Was it a car or truck?

A. It was a car.

Q. And it wasn't this truck that we're talking about?

A. No.

Q. Do you remember anything about the woman?

A. She was dark skinned, not real dark. Little lighter than me.

Q. Did Desmond Ledet have any reaction to you after he asked if you wanted to buy a watch?

A. I asked him, do you remember me?

Q. What did he say?

A. He looked. So I was, like, he actually don't remember me, you know. So at that time he was just determined to sell his watch. My friend told him no, he didn't have no money. And at that time, I guess, I don't know if it came to mind that he start remembering who I was and he left -- they left quickly.

Q. Did you believe he realized who you were?

Page 57

A. Uh-huh.

MS. GILLAND: Objection, speculative.

THE COURT: Sustained.

Q. (BY MS. McCORMICK) Did he do anything that made you think he recognized you?

A. I kept asking him, don't you remember me? I kept asking him that question.

Q. You know the look on people's faces when they finally realize who you are, did you see that look on Desmond Ledet's face?

A. Yes, I did.

MS. McCORMICK: May I approach the witness?

THE COURT: Yes.

Q. (BY MS. McCORMICK) Okay. Melvinna, I'm going to show you a picture. We've marked it as State's Exhibit 19. Do you know who is in that picture?

A. That's me.

Q. Is that your driver's license picture?

A. Yes, it is.

Q. And did you look about the same in this picture as you did back in 2004?

A. Yes. I think I actually took that picture in 2004, if I'm not mistaken.

Q. And did you look about the same when Desmond Ledet tried to sell you a watch as you did in State's

18 (Pages 54 to 57)