**Opinion filed March 4, 2021**



# In The

# Eleventh Court of Appeals

_____

## No. 11-19-00077-CR

_____

## MICHAEL SHAWN GOOTEE, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 42nd District Court**

**Taylor County, Texas**

**Trial Court Cause No. 26943A**

## M E M O R A N D U M   O P I N I O N

The jury convicted Michael Shawn Gootee of the murder of Donald Ray Perkins, Jr. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (c) (West 2019). The jury assessed his punishment at confinement for twenty years in the Institutional Division of the Texas Department of Criminal Justice. In a sole issue, Appellant asserts that he received ineffective assistance of counsel. We affirm.

*Background Facts*

Appellant was convicted for the murder of Donald Ray Perkins, Jr., also known by the street name "June Bug." The indictment charged Appellant with murdering June Bug by intentionally and knowingly causing his death by shooting him with a firearm or by intending to cause serious bodily injury and committing an act clearly dangerous to human life by shooting June Bug. *See id.* § 19.02(b)(1), (2).

On the evening of June 26, 2016, June Bug was found dead on the side of the road in Abilene, Texas, around 9:00 p.m. Near the body, a dark red Honda Accord was parked and running, the radio was on, and the decedent's wallet and cell phone were inside the vehicle. A cigarette was still burning in the right hand of the deceased. Ironically, June Bug was wearing a belt with a belt buckle that bore the name of Appellant's fifteen-year-old daughter.

June Bug had been shot six times with a .45 caliber pistol. Six shell casings were recovered near the body. The gunshot wounds were two to the torso, one in each thigh, one in the right knee, and one to the right side of the head. A firearms expert testified that the bullets were from a .45 caliber handgun that was likely a semiautomatic, as opposed to a revolver.

Detective Jonathan Merrick with the Abilene Police Department's special victim's unit was the lead detective in the investigation of June Bug's murder. Detective Merrick testified that, although there were not many leads at the outset of the investigation, another officer contacted him on June 27 and informed Detective Merrick that a report was taken involving June Bug that could possibly shed light on the investigation. The report was for sexual assault and listed June Bug as the perpetrator. Detective Merrick also learned through his investigation that Appellant's ex-wife, Amanda Gootee, had had an affair with June Bug while she was still with Appellant. June Bug, at one point in time, had even lived with Amanda and her children, including A.G., Appellant and Amanda's fifteen-year-old daughter

whose name appeared on the belt buckle June Bug was wearing. Based on the early leads in the investigation, Detective Merrick determined that Appellant was a suspect in June Bug's murder.

Four days prior to the murder, Appellant and his new wife, Lauren Gootee, had driven to Abilene from Las Vegas, Nevada. The two were staying temporarily with Appellant's parents in Abilene. On Friday, June 24, Appellant brought three of his children to his parents' house to visit with their older sister, Haleigh Gootee. That evening, A.G. made an outcry of sexual assault to Lauren. Appellant took A.G. to the hospital for an exam the following day, June 25, one day prior to June Bug's murder.

Detective Merrick's investigation uncovered multiple threats having been made against June Bug's life by Appellant on the day of the murder:

- Selena Rich, an employee of Firehouse Bar in Abilene, testified that, on June 26, Appellant entered the bar and stated that he was looking for June Bug. Appellant told Rich that June Bug had raped Appellant's daughter and that, if Appellant found June Bug, he was going to kill him.

- Anne Angely, an employee of Spanky P's Tavern in Abilene, testified that on the same day, June 26, Appellant entered Spanky P's and asked Angely if she had seen June Bug. Appellant told Angely that June Bug had raped his daughter.

- Carolyn Rose-Barfield arrived at the Hour Glass bar during that same afternoon and saw Appellant inside. Appellant asked Rose-Barfield if she knew June Bug. Appellant stated that June Bug had raped his daughter and that, when he found June Bug, he was going to kill him.

- Pamela Cozart, an employee of the Hour Glass on June 26, testified that she saw Appellant at the Hour Glass that day and that Appellant was looking for a man named June Bug. Appellant told Cozart that he wanted to have a

3

discussion with June Bug and that they "probably wouldn't see [June Bug] again."

Lauren Gootee testified that she and the children had been out shopping during the afternoon hours of June 26 and arrived back at her in-laws' house around 6:00 p.m. She testified that she made meatloaf for dinner, which was ready at 8:00 p.m., and that Appellant drove up on his motorcycle right when it was ready. Appellant told her that someone was going to drop by the house later to get a tire fixed. Around 8:30 p.m., a female unfamiliar to Lauren knocked on the door and greeted Appellant, Lauren, and the children by name. The woman then drove a gray Camaro into Appellant's father's shop, which was on the same property as the house. Lauren saw someone sitting in the backseat but could not tell who it was. Additional testimony revealed that the woman was Kimberly Self and the passenger was Barry Pilgreen, who both claim to have been eyewitnesses to the events leading to June Bug's murder. Approximately ten minutes after Self and Pilgreen left, Appellant rode his motorcycle to a convenience store to purchase cigarettes, but he immediately returned because he had forgotten his wallet. The store was less than one mile away, and Lauren testified that she ended up going to the store instead with one of the children. Upon arriving back at the house, Appellant's motorcycle had not moved since she left, and Lauren believed that Appellant was in the shop because the lights were on. Lauren testified that Appellant was with her at the house for the remainder of Sunday night. Lauren also testified that she could account for Appellant's whereabouts for the entirety of the evening of June 26, with the exception of only two minutes when he went to the convenience store. Therefore, Lauren asserted that the only way that Appellant could have been the one to shoot June Bug was if he had done it before 8:00 p.m. because Appellant had not been out of her sight for longer than two minutes, which was not enough time to get to the crime scene and back. Detective Merrick testified that it would take approximately

4

"eight and a half minutes" to drive from Appellant's father's house to the crime scene.

Kimberly Self testified that, on the evening of June 26, she and her ex-husband, Pilgreen, went to Appellant's father's house to get a tire fixed. She testified that Pilgreen was conversing with Appellant in the shop and that Appellant told Pilgreen that June Bug had molested Appellant's daughter. Pilgreen told Appellant that Self had contacted June Bug earlier. Self testified that Pilgreen and Appellant asked her to contact June Bug again to see if he would meet up with her. She left a voicemail for June Bug and later talked to him and asked him to meet her at a location chosen by Pilgreen. Self testified that, upon leaving the shop, she and Pilgreen went straight to the predetermined location to meet June Bug. Appellant arrived on his motorcycle shortly thereafter, but then drove off. June Bug arrived soon thereafter driving a red car. June Bug and Self spoke outside of their vehicles for less than five minutes at the location.

According to Self, Appellant then arrived holding a gun between the handlebars of his Harley-Davidson. She stated that the gun was large and was silver or nickel colored. Appellant told June Bug, "I know what you did to my daughter." Appellant then told Self to get in her car and leave, and Self claimed that she did so with Pilgreen in the passenger seat. As they pulled away from the scene, Self heard two, possibly three gunshots. Self claims to have stopped shortly thereafter to let Pilgreen drive because she was driving "erratically." Self testified that Pilgreen prevented her from calling the police and that he told her to deny having seen Appellant and to never admit any involvement in the events that took place. She initially did so but, later, confessed to having seen Appellant when she learned that Pilgreen, when questioned, told police that she was at the scene. Self was charged with murder but reached an agreement with the State to plead guilty to manslaughter.

5

Barry Pilgreen's testimony tracked that of Self, but with a few key differences. Pilgreen, a convicted felon, was living with Self on the day of the murder and had just been released from prison on parole the month before. Pilgreen testified that he went with Self to Appellant's father's shop looking for help with flat tires. Pilgreen claimed to have been a mere passenger while Appellant and Self had a conversation, during which Appellant described his daughter being molested by a guy named June Bug. Pilgreen denied having previously known anyone by that name. According to Pilgreen, Self told Appellant that she knew June Bug, and she used Facebook to contact June Bug and fabricate a story about needing help with a tire.

Pilgreen testified that, after the tires were fixed at Appellant's father's shop, he and Self went to the predetermined location where June Bug was to meet them. Approximately ten minutes later, Appellant arrived on a Harley, spoke to Self, and then left. June Bug arrived five minutes later and started talking to Self outside the vehicle. Appellant then arrived holding a large silver pistol. Pilgreen testified that Appellant began shooting before Self got back in the car. Pilgreen said that he heard two shots before leaving and at least one more while driving away. Pilgreen admitted to switching seats with Self after leaving the scene because she was driving erratically, and he claimed that the two of them then went to her apartment and did not notify law enforcement.

Hailey Gootee, Appellant's daughter, testified that she was with Appellant a few days prior to June Bug's murder when Appellant showed her a .45 caliber 1911 handgun, stainless or silver colored in finish with a wooden grip. During the police investigation, the murder weapon involved was not found.

No fingerprints could be lifted from the .45 caliber casings found at the scene, and no blood DNA could be confirmed from Appellant's motorcycle. Dianna Arndt, a forensic specialist with the Abilene Police Department, testified as to her involvement in the investigation of June Bug's murder. Arndt collected six shell

casings from the scene and processed the car and cell phone for fingerprints. Arndt was only able to get one latent print from the car, and that print matched June Bug. On June 28, Arndt also processed a motorcycle, testing it for the presence of blood and gunshot residue. Multiple areas were swabbed, and the report created by the Tarrant County Medical Examiner's Office revealed that the presumptive tests indicated the possible presence of blood but that there was not enough for a DNA profile. Arndt also swabbed the motorcycle's handlebars for gunshot residue, but she did not know whether those swabs were tested after she turned them in. Detective Merrick testified that the gunshot residue kits were not tested because too much time had elapsed between the murder and collection.

Appellant did not testify at trial. He was convicted and sentenced to confinement for twenty years. Appellant filed a motion for new trial alleging ineffective assistance of counsel, and a hearing was held on the motion. Appellant asserted numerous grounds for ineffective assistance, including but not limited to trial counsel's failure to cross-examine witnesses, failure to investigate and call two peripheral witnesses that Appellant had identified as resources, and failure to object to the State's late production of a video of his wife's questioning by police. Appellant's trial counsel, Trey Keith, testified at the hearing on the motion for new trial.

*The Issue*

In his sole issue, Appellant alleges that he received ineffective assistance of counsel at trial. He asserts four grounds on which he believes Keith failed to adequately represent his interests. First, Appellant claims that Keith failed to investigate facts of the case regarding Appellant's suggested witnesses: Misty Cox and a DPS employee from Anson. Next, he asserts that Keith failed to adequately cross-examine an accomplice witness, Pilgreen, regarding an alleged inculpating statement made to police. Third, Appellant asserts that Keith failed to object,

7

preserve error, or otherwise contest the issues related to the untimely production of the police interview of his wife, Lauren. Lastly, Appellant claims that, but for the cumulative unprofessional errors of Keith referenced above, the result of Appellant's trial would have been different.

*Standard of Review*

To establish that counsel rendered ineffective assistance at trial, Appellant must show that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that the result would have been different but for counsel's errors. *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999) (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Strickland*, 466 U.S. at 694. There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance, and the defendant must overcome the presumption that the challenged action could be considered sound trial strategy. *Id.* at 689. A failure to make a showing under either prong of the *Strickland* test defeats a claim of ineffective assistance of counsel. *Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010).

"We review the totality of the evidence when evaluating Appellant's ineffectiveness claim." *Id.* at 894. A claim of ineffective assistance of counsel "must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson*, 9 S.W.3d at 814 (quoting *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996)). Direct appeal is usually an inadequate vehicle to raise such a claim because the record is generally undeveloped. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005).

We note, however, that Appellant filed a motion for new trial alleging ineffective assistance of counsel and that the trial court conducted a hearing on the motion. At the hearing on Appellant's motion for new trial, Appellant's trial counsel

was afforded an opportunity to explain his trial strategy. The trial court ultimately denied the motion.

*Analysis*

Regarding Appellant's first contention, asserting Keith's failure to interview or call witnesses whom Appellant identified as relevant or necessary, trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. If trial counsel fails to investigate witnesses, particularly eyewitnesses, this failure can support an ineffective assistance of counsel claim. *Joseph v. State*, 367 S.W.3d 741, 744–45 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). A reviewing court determining whether counsel's performance was ineffective does not second-guess these decisions but, rather, looks to the "reasonableness" of the attorney's actions *at the time he made the decisions*. *Strickland*, 466 U.S. at 690–91.

"When challenging an attorney's failure to call a particular witness, an 'applicant must show that [the witness] had been available to testify and that his testimony would have been of some benefit to the defense.'" *Ex parte Ramirez*, 280 S.W.3d 848, 853 (Tex. Crim. App. 2007) (alteration in original) (quoting *Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004)). Trial counsel's failure to present certain evidence is immaterial absent a showing that the evidence was available and that the evidence would have affected the outcome of the proceeding. *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983).

Appellant identified Misty Cox as a person he would have liked to attend the trial and give testimony that would have been favorable to Appellant's case. Appellant claims that he was with Cox "near the time" in which the murder took place and that Cox would have testified that Appellant was not angry and did not mention wanting to find and kill June Bug. Appellant contends that this testimony would have been relevant because the State introduced evidence that Appellant

9

entered several bars where he asked patrons and staff if they knew where June Bug was, stated that June Bug had raped Appellant's daughter, and said that he was going to kill June Bug.

Keith testified at the hearing on the motion for new trial that the first time he met Cox was in the courtroom during Appellant's trial and that, at that time, Keith did not know whether Cox had relevant information to divulge or not. Keith admitted that there may have been a suggestion that Cox could have testified that she was with Appellant around the time the murder took place and that, during that time, Appellant did not seem "like he was going to go off and kill somebody." Keith testified that he never had a conversation with Cox and that nobody ever suggested calling Cox specifically as a witness. Keith also testified that, while it may have been suggested that Cox could testify as to Appellant's demeanor, "it was never brought to [his] attention or suggested to [him] that, for instance, Misty could say during the relevant time period, [Appellant] was at the house."

Appellant's wife, Lauren, also identified a potential witness: a Texas Department of Public Safety employee in Anson, who, on the Monday following the murder, administered a commercial driver's license test to Appellant. Appellant contends that Keith should have conferred with the DPS employee to determine whether the employee remembered Appellant and if it seemed like Appellant had recently been through something traumatic, like shooting a man the night before. Appellant claims that, by failing to investigate and interview this witness, Keith was ineffective in his representation. We disagree.

At the hearing on the motion for new trial, Keith testified that he did not meet with this potential witness because "there's absolutely no point, nothing probative about any testimony to that effect. And so I didn't call that guy. I didn't try to call that guy, and I wouldn't do it today." Keith also testified that calling this witness could have "backfired" and that it was part of his trial strategy "to not advance absurd

10

propositions" like this one. Indeed, it would not be unreasonable for trial counsel to avoid such testimony and prevent the DPS employee from becoming an adverse witness with unanticipated examination by the State and/or to avoid a perception by the jury that the lack of Appellant's emotion in the presence of either witness was "cold blooded." We believe that Appellant has failed to show that the testimony of his potential witnesses would have in fact aided his defense in any material way. Appellant did not present these witnesses at the hearing on the motion for new trial, nor did he provide sworn affidavits authored by these witnesses. We cannot speculate what the witnesses might have said. Therefore, we disagree with Appellant that counsel was ineffective by failing to further investigate the facts of the case by interviewing or calling witnesses whom Appellant identified as relevant or necessary.

Appellant's second assertion is that Keith was ineffective in failing to cross-examine an accomplice witness, Pilgreen, regarding an alleged inculpating or impeachable statement made to police during their investigation.

Appellant argues that Pilgreen is a "very important" witness in this case. Pilgreen was present during the murder and claims to have witnessed Appellant arrive at the predetermined location on a Harley with a pistol in his hand. Pilgreen claims to have heard a shot, but did not actually see Appellant shoot June Bug. Furthermore, Appellant notes that Keith admitted that he knew Pilgreen had made a statement to police during interrogation along the lines of: "And you know, if I have to go to jail for this, so be it; he deserved what he got." Appellant claims that this statement was inculpatory and could have amounted to an admission. Additionally, Appellant asserts that, because Pilgreen's statement to police did not align with prior indications that he did not know June Bug, Pilgreen's testimony was not trustworthy. Appellant argues that the testimony of Pilgreen and the testimony of Self were the "pillars of the [S]tate's case" and that Keith should have cross-examined Pilgreen

11

further to exploit the inconsistencies in his testimony compared to Self's. Appellant's assertion is that, by not doing so, Keith was ineffective in his representation. We disagree.

"Cross-examination is inherently risky, and a decision not to cross-examine a witness is often the result of wisdom acquired by experience in the combat of trial." *Ex parte McFarland*, 163 S.W.3d 743, 756 (Tex. Crim. App. 2005) (citing *Coble v. State*, 501 S.W.2d 344, 346 (Tex. Crim. App. 1973)). "Furthermore, cross-examination is an art, not a science, and it cannot be adequately judged in hindsight." *Id.* "If ineffective, cross-examination can serve to bolster the credibility of the witness and underscore the very points that are sought to be impeached." *Dannhaus v. State*, 928 S.W.2d 81, 88 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd). Thus, unless there is a good basis on which to cross-examine a witness, which Appellant has not necessarily shown here, it can be more effective to refrain from cross-examining a damaging witness in order to minimize the impact of his testimony. *Id.*

Keith testified at the hearing on the motion for new trial that he was aware of Pilgreen's statement to law enforcement but did not think that it amounted to an admission or confession. Keith testified that, taken in the context of the entire interview, Pilgreen's statement was not inculpatory and that there was nothing to be gained by cross-examination relating to the statement, in part because Pilgreen was not suspected of having committed the crime. Keith reasoned that cross-examination about Pilgreen's statement would simply be a "waste of time or a distraction."

Considering the circumstances, we conclude that it was reasonable for counsel to not cross-examine Pilgreen regarding the statement he made to law enforcement. There is nothing in the record to show that the decision by Keith to not cross-examine Pilgreen was anything other than trial strategy. An appellate review of defense counsel's performance is highly deferential, and we presume that counsel's actions

12

fell within the wide range of reasonable and professional assistance. *Strickland*, 466 U.S. at 689; *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002); *Walker v. State*, 406 S.W.3d 590, 594 (Tex. App.—Eastland 2013, pet. ref'd). Here, we have closely examined the trial record and defer to trial counsel's judgment in discerning what strategy he should employ in the crucible of trial based upon his first-chair view of the trial events and its dynamics, as well as his litigation experience and instinct. Appellant has failed to overcome the presumption that Keith's conduct was reasonable and professional. *See Bone*, 77 S.W.3d at 833.

Appellant's third contention is that Keith was ineffective by failing to object, preserve error, or otherwise contest the issue of late-presented evidence. During day two of the trial, Appellant was preparing to call his first and only witness, Lauren Gootee. Her testimony was intended to advance Appellant's defensive theory that Appellant could not have committed the murder as alleged because she claimed to be able to account for Appellant's whereabouts for a sufficient time that would allegedly have made it impossible for Appellant to have committed the murder.

Shortly before Lauren was to take the stand, Keith was made aware of the existence of a recorded police interview of Lauren. While bringing this matter to the attention of the trial court, Keith stated that, "well, in any case[,] neither the State nor myself were aware of its existence." However, Appellant asserts that both Keith and the State "had foreknowledge of the existence of this video, and [counsel] had asked for discovery many times, and discovery had been supplemented as it became available to the State's attorney, but this video had never been produced." Keith testified at the hearing on the motion for new trial that both he and the prosecutor believed that the video no longer existed and that "it was a surprise, I believe, to [the prosecutor] that it existed." In light of the circumstances presented, the trial court granted a ninety-minute recess, allowing Keith, Appellant, and Lauren to view the video in full.

Appellant asserts that Keith should have objected to proceeding with trial after the video was produced. Appellant argues that, by failing to do so, Keith did not prepare a cohesive trial strategy considering all of the available evidence. Appellant claims that Keith knew of the existence of the video because Lauren had told him about it, yet Keith did not require the State to produce it and did not object to any mention of the video at trial. Based on these assertions, Appellant contends that he received ineffective assistance of counsel. We disagree.

In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also Ex parte Lalonde*, 570 S.W.3d 716, 724 (Tex. Crim. App. 2019). "Thus, *Brady* is violated when three requirements are satisfied: (1) the State suppressed evidence; (2) the suppressed evidence is favorable to the defendant; and (3) the suppressed evidence is material." *Lalonde*, 570 S.W.3d at 724. "Incorporated into the third prong, materiality, is a requirement that [the] defendant must be prejudiced by the state's failure to disclose the favorable evidence." *Id.* (alteration in original) (quoting *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006)).

However, where the prosecution has not completely failed to disclose exculpatory evidence, but rather has disclosed *Brady* material during an ongoing trial, then the first element of the showing to establish a *Brady* violation is modified. *Fitzgerald v. State*, No. 11-96-202-CR, 1997 WL 33797948, at *2 (Tex. App.— Eastland May 15, 1997, pet. ref'd) (not designated for publication). "[T]he disclosure of *Brady* material at [or just before] trial gives the accused an opportunity to request a continuance to review the evidence, and this opportunity adequately satisfies the due process requirements of *Brady*." *Cohen v. State*, 966 S.W.2d 756,

763 (Tex. App.—Beaumont 1998, pet. ref'd); *accord Perez v. State*, 414 S.W.3d 784, 790 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("The disclosure of *Brady* material during trial satisfies the requirements of due process '[i]f the defendant received the material in time to put it to effective use at trial.'" (alteration in original) (quoting *Palmer v. State*, 902 S.W.2d 561, 565 (Tex. App.—Houston [1st Dist.] 1995, no pet.))).

This is not a case where the State received *Brady* evidence but then sat on it and failed to turn it over to the defense. *See Perez*, 414 S.W.3d at 789. The State claims to have only been made aware of the existence of the recording a few hours before providing Appellant with a copy, which occurred on day two of testimony. Keith asked for and was granted a ninety-minute recess to allow him to review the recorded interview. Appellant, Keith, and Lauren all watched the recorded interview during the recess. Keith testified at the hearing on the motion for new trial that nothing stated in the video by Lauren was any more or less relevant to the facts at issue than what she had already conveyed to Keith. There was no further exculpatory evidence provided in the recorded interview that had not been independently given to Keith by Lauren previously.

Here, Appellant has not shown that the disclosure of the video came at a time when he was no longer able to put the material to effective use at trial or that the effect of the late disclosure created a probability sufficient to undermine the confidence in the outcome of the trial. Regarding this matter, this appellate court has reviewed in detail the direct, cross, and redirect examination of Lauren following the defense's review of the video. The video was not used as a material impeachment device. Based on our review, and applying the proper standards of review, we cannot reasonably conclude that Keith was ineffective with regard to the video. Any delay by the prosecutor to disclose the existence of the recording at the

earliest opportunity did not create a probability sufficient to undermine the confidence in the outcome of the trial.

Lastly, Appellant argues vaguely that, but for the unprofessional errors of Keith, the outcome of Appellant's trial would have been different. However, nothing in the record demonstrates that Keith's representation at trial was the product of an unreasonable strategy or shows how, if at all, the outcome of the proceeding would have been different absent the alleged deficiencies. *See Ex parte Flores*, 387 S.W.3d 626, 638 (Tex. Crim. App. 2012). Based on the totality of the representation and the circumstances present in this case, we cannot conclude that the record reveals deficient performance sufficient to overcome the presumption that the representation fell within the range of reasonable professional assistance. *See Strickland*, 466 U.S. at 687–89. Therefore, Appellant has not met his burden under the first prong of the *Strickland* test. *See id.* at 687–88.

Furthermore, the record does not show a reasonable probability that the result of the trial would have been different but for counsel's alleged errors, individually or cumulatively. *See id.* at 694. Witnesses testified that Appellant told them on the day of the murder that he was looking for June Bug, that June Bug had raped Appellant's daughter, and that Appellant was going to kill him. Two witnesses saw Appellant arrive at the eventual murder scene on a motorcycle and point a silver handgun at June Bug. Appellant was known to have owned a .45 caliber handgun matching the description of the murder weapon and had even shown that handgun to individuals who testified at trial. Thus, Appellant has not met his burden under the second prong of the *Strickland* test. *See id.*

Based on the totality of the evidence presented at trial, we cannot conclude that Appellant has satisfied either prong of the *Strickland* test. Accordingly, we overrule Appellant's sole issue on appeal.

16

*This Court's Ruling*

We affirm the judgment of the trial court.

W. BRUCE WILLIAMS

JUSTICE

March 4, 2021

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.