

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00153-CR

———————————————

JACOB ANDREW KOSINE, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 432nd District Court
Tarrant County, Texas
Trial Court No. 1702953R

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Kerr

**MEMORANDUM OPINION**

On May 9, 2017, Appellant Jacob Andrew Kosine entered his neighbors' house in Fort Worth without their consent and violently assaulted Naomi—who was 18 years old at the time—and her mother, Camille.[1] Kosine pleaded not guilty by reason of insanity to all counts of the resulting indictment. A jury found him guilty of one count of burglary of a habitation, one count of aggravated sexual assault, and two counts of aggravated assault with a deadly weapon and assessed his punishment at life in prison for each count.[2] Kosine raises two issues on appeal: (1) that insufficient evidence supports the jury's guilty verdict on the indictment's sixth count (aggravated assault against Camille with a deadly weapon) and (2) that the jury's verdicts were manifestly unjust because evidence supporting Kosine's insanity defense greatly outweighs the State's contrary evidence. We will overrule Kosine's issues and affirm the trial court's judgment.

## I. Background

The State conceded at trial that Kosine had a mental illness and experienced delusions. The major contested issue was whether, as a result of that mental illness, he "did not know that his conduct was wrong." *See* Tex. Penal Code Ann. § 8.01(a).

---

[1] To protect their identities, we will identify the victims by pseudonyms.

[2] Because of his prior and sequential felony convictions, Kosine faced an enhanced punishment range for his offenses. *See* Tex. Penal Code Ann. § 12.42(d).

## A. Camille's testimony

Camille testified that on the morning of May 9, 2017, she was at home showering while Naomi was getting dressed and doing her makeup. They were the only people in the house at the time, but they were getting ready for a fun day with family. As Camille was dressing after her shower, they heard someone at the door. Because Camille was not yet dressed, Naomi went down to answer the door, expecting to find her brother there. Camille then heard a "horrible," "almost inhuman" scream. She immediately ran downstairs without finishing getting dressed[3] and saw Naomi struggling with a male.

The man's back was to Camille, but she recognized him as her neighbor Kosine. She punched and beat his back and yelled at him. She saw he had "a wooden rod of some sort" up against Naomi's throat. She testified that the rod "seemed like it was a cubed stick made out of wood." Naomi's "face was turning red[, s]he wasn't making . . . normal noises[, and s]he couldn't talk." Camille thought Naomi was going to die. Camille testified that she used all her force to try and get the stick away from Naomi's throat and that it was "[v]ery" difficult. She further testified that she and Naomi "ended up both on our backs" and that the struggle "went on for a long time." Kosine hit Camille in the knee with the stick and kneed her in the head. She testified that he was holding them both down by their hair, but they were still trying to fight him off. Camille

---

[3]Naomi testified that, from what she remembered, Camille was completely naked during the struggle. Camille testified that she had shorts on.

managed to grab a bowling pin[4] and "conk" Kosine on the head hard enough to draw "[a] lot of blood," but he was "[b]arely dazed at all" and did not stop his assault. Eventually, she testified, there came a point where she and Naomi were both too hurt and exhausted to continue struggling with Kosine. She then described his sexually assaulting Naomi and Naomi's crying.

On cross-examination, Camille testified that several days before the assault, Kosine had come to the door around midnight asking, in an "extremely weird" conversation, to date or marry Naomi. He was sent away, and the next day his mother came over and apologized for his disrupting their evening that late at night. Camille testified to another occasion on which he had come over around 11:00 at night and talked to her about block parties—events that Camille said their neighborhood does not have. When asked if she had observed anything that made her believe that Kosine had any type of mental illness, Camille responded, "Oddities. . . . [H]e would play in the cul-de-sac. That's odd for a grown man."

### B. Naomi's testimony

Naomi testified that on May 9, 2017, she answered the front door at her parents'

---

[4]The family were recreational bowlers and kept a bowling pin by the door as a decoration.

house and told Kosine,[5] "Hey, I don't . . . know you, and . . . I need to close the door." She tried but failed to push the door closed. Kosine pushed her to the floor and "pinned" her with his body weight. She screamed, and Camille came rushing down the stairs.

Naomi remembered that Kosine "had two like implements, like two sticks," and she remembered "trying to restrain his hands so he couldn't hit [her mother and her] with them." She also remembered her mother trying to pull Kosine off her and telling him, "You -- you don't know her. Stop." He kept telling Naomi that he loved her. Camille said, "You don't even know her, you don't -- you don't even know her name." Kosine asked Naomi multiple times what her name was.

Naomi managed to break free, but every time she got away, Kosine pulled her back by her hair. The most vivid moment she remembered was his strangling her while she was on her back; she felt she was going to die. Because he was strangling Naomi, Camille came up behind him and hit him in the head with the bowling pin.

Naomi next remembered that all three of them "ended up in [the] living room," where Kosine had both Naomi and Camille by their hair and was angrily demanding that Naomi take off her clothes. Naomi refused, and he pushed them both onto the floor, still holding them by their hair. Naomi testified that she was using as much force

---

[5]At trial, Naomi identified Kosine as the man who had come to her door. She testified that she had known that "he existed" and that they were neighbors but that she had seen him only a couple of times before the assault.

as she could to get away. She remembered him saying, "Don't move, don't talk, don't think." He pushed Naomi onto her back and sexually assaulted her.

### C. Kosine's testimony

Kosine, 42 years old at the time of trial, testified that he was a paranoid schizophrenic. He testified that he had been hospitalized six times in multiple different state hospitals, all because of his illness. At the time of trial, he was taking Haldol every day and had taken other antipsychotic medications. He testified that he had heard voices when he was unmedicated, but it had "been a long time" since he had heard voices.

Kosine testified that in May 2017 he liked to skate around the neighborhood at night and play hockey in the streets. As background for explaining the events of May 9, 2017, Kosine claimed that he and "the police officer in . . . our neighborhood, Mark, . . . came up with an idea" to "do a 4th of July block party." He testified that when he had first gone over to Camille's house to invite the family, Camille answered the door and started behaving provocatively but that she had also encouraged him on other occasions to "get" Naomi.

He testified that on May 9, 2017, he went to the family's house to ask Camille and her husband, Ted, what they had decided about the 4th of July party. Naomi answered the door "in her little panties and this little negligee thing."[6] He testified, "The

---

[6]Other evidence suggested that Naomi was wearing a green dress.

voices told me just go for it, just be bold. . . . And so I just pounced through the door[,] and I grabbed her." Then Camille came downstairs "topless" and said, "Jake, take me; take me, Jake." He said that he walked toward Camille hand in hand with Naomi and started caressing Camille's breasts while holding Naomi's hand.

Regarding the "sticks" that he had used, he explained that he had "two sets of sticks," which he described as "replica light sabers." He testified that one was a pair of worn-down hockey sticks that he had "cut . . . exactly to length," and the other was "a set of batons that were small ones that represented the light sabers when they were turned off."

Kosine recalled getting hit in the head with a bowling pin and having sex with Naomi, although his version of events differed radically from Camille's and Naomi's.[7] He testified that he believed he had been invited into the house and that they both "desperately wanted to have sex" with him, although he also recounted that at one point Naomi had said, "If I just give it to you, will you just go?" Nevertheless, he testified that "[a]t that time I believed [Camille] wanted it. I believe [Naomi] definitely, definitely wanted it." Kosine agreed that he knew that burglary and sexual assault are crimes.

---

[7]Because Kosine's second issue concerning his insanity defense essentially asks us to change the law by rejecting controlling precedent about what the concept of "wrong"—that is, "illegal"—means to an insane person, we need not set out his graphic testimony in great detail in order to analyze that issue.

## D. Expert testimony

Defense expert Dr. Antoinette McGarrahan, a licensed psychologist specializing in forensic psychology and neuropsychology, testified that she had interviewed and evaluated Kosine on three occasions—September 4, 2017; January 8, 2019; and February 6, 2019. Dr. McGarrahan had been trained to evaluate individuals with severe mental illness, and she testified that Kosine suffered from schizophrenia, which she defined as "a severe mental illness that is characterized by delusions and hallucinations or very disorganized behavior." In addition to speaking with Kosine and his parents, she reviewed his hospital records and his records from inpatient units within the prison system. Dr. McGarrahan opined that "Kosine was suffering from a severe mental disease or defect at the time of the offense such that he didn't know his conduct was wrong." She testified that he "did not think what he was doing was sexual assault. What he thought he was doing was engaging in not just consensual sex but that greatly desired by the victims."

On cross-examination, Dr. McGarrahan acknowledged that Kosine had told her in one of the 2019 evaluations that he was used to the delusions and hallucinations and that he ignored them and knew that they were deceptive. On redirect examination, however, she testified that he was on medication at that point in time and that the medication "helps either remove the voices or at least reduce them so that they are not as loud, not as powerful." She testified that it is "very common" for someone with schizophrenia to be able to say that he ignores the voices while on medication and after

8

returning from the state mental hospital.

In rebuttal, the State called Dr. Christine Reed, a clinical and forensic psychologist. Dr. Reed testified that she met and evaluated Kosine after reviewing "quite a bit of records," including the evaluations done by Dr. McGarrahan and by another evaluator.[8] She agreed with Dr. McGarrahan that Kosine has a mental disease or defect, but she gave him a slightly different diagnosis: schizoaffective disorder.[9] She testified that she had "no doubt" that he was hearing voices during this psychotic episode, and she believed that the crime would not have happened but for his mental illness. But in Dr. Reed's opinion, Kosine "did not meet the criteria for insanity at the time of the offense . . . [b]ecause he knew that what he was doing was wrong." On cross-examination, she agreed that "sometimes the voices tell us to do violent things," but "sometimes you can also still know" that such actions are "wrong."

Dr. Reed noted several things Kosine had said to her or to the other evaluators that suggested he had known that what he was doing was wrong:

- Kosine had characterized the entire criminal episode to her and to Dr. McGarrahan as a "playful" and "consensual act." But he had told Dr. McGarrahan that the victims were initially afraid. Dr. Reed thought it was "significant that he was registering in that moment that this wasn't this

[8]Dr. Price—the other evaluator who saw Kosine in 2019—died before trial.

[9]Dr. Reed explained that schizoaffective disorder is "kind of a combination between . . . bipolar or manic depressive disorder . . . and the schizophrenia." She "felt like he had a combination of both" because "he hears voices intermittently throughout, but he also has these periods of mania and potentially depression. But he's psychotic even at times when he is not in one of those periods."

9

romantic consensual encounter."

- His acknowledgment that Naomi had told him, "If I give it to you, will you just go away," showed that he was "in reality at that moment, and he's reacting to what she's saying. So he knew what that meant. He knew she was talking about sex, [which] doesn't really fit this romantic consensual encounter that he was discussing."

- Kosine had told Dr. Price that when he initially came through the front door, he put his hand over Naomi's mouth "because he . . . didn't want the neighbors to hear what was going to happen and [thought] they might get the wrong idea if she were screaming, so he covered her mouth." He mentioned a particular neighbor who was a police officer whom Kosine "didn't want to hear" what was happening.

- Kosine had described the general offense to Dr. Price as being "like a romance novel where the woman wants to be . . . raped. And then he said, [']Not raped, scratch that.['] So he kind of backed out of it."

- Kosine had admitted to Dr. Reed that he had lied to the police officers at the hospital about the source of his injuries, which she thought was significant "because it suggested he knew to hide that piece of information from police because he was in trouble." She asked why he had lied, and he told her that "he thought the police were either [sic] to arrest him because something had gone wrong."

Dr. Reed also noted critical differences between what Kosine described and the known facts of the offenses:

- He had "told Dr. Price that when the police arrived, they went to war with him even though he tried to cooperate, which [was] not how the facts played out."

- Kosine had "downplayed the violence" to her and to others, "suggesting that he was hiding the level of violence, that this wasn't this romance novel, again, to use his words, you know, fantasy; that this was a violent act[,] and it doesn't match up with his delusions even about -- about what was going on." He had told both her and Dr. McGarrahan that he had gently laid Naomi and Camille down on the ground; that he wrestled with them; that he "bear hugged" them; and that they were "play acting" when

they tried to get away. In fact, Kosine had accused Naomi and Camille of lying to the police about his being violent with them; he said that he "didn't raise a hand to these girls," but then he acknowledged that they "didn't lie about everything" and that he was "roughhousing" with them. According to Dr. Reed, "he thought he needed to dominate them, and so he did dominate them.

- She specifically mentioned Kosine's putting Naomi in a chokehold and saying things like, "She's mine," as examples of how "the level of violence doesn't match up with what he describe[d]."

- Kosine was aware—and acknowledged to other examiners—that he had been hit in the head with a bowling pin to the point that it had caused him to bleed. He told one of the other examiners that he had been "hit . . . pretty hard, [was] cut . . . wide open, [and] had blood running down his head." This too, Dr. Reed said, did not "fit with this delusion of this romantic romance novel roughhousing that he described. This was a violent offense."

Dr. Reed found it "concerning" that Kosine told her that he had first realized that his offense was wrong when he saw Naomi crying in front of the police—that that was his "cue"—when in fact Naomi had been screaming "[f]rom the . . . moment that the offense was initiated." Ultimately, Dr. Reed maintained her opinion that Kosine knew that "what he was doing at the time was wrong."

### E. Other testimony and evidence

Ted—Camille's husband and Naomi's father—authenticated a video recording from a camera that he had installed outside their front door. The video showed Kosine entering and leaving the house on the day of the assault. Loud screaming can be heard

11

immediately after he entered the house through the front door.[10] The video also captured him walking away from the house with two large sticks in his hand and a bloody wound on his head.

Fort Worth Police Officer Drew Hernandez and two other officers entered Kosine's residence in response to a call on May 9, 2017.[11] Upstairs, they saw that Kosine was bleeding from the head, was wearing only underwear, and was "armed with two weapons in his hands." According to Officer Hernandez, Kosine "was holding them in an offensive manner . . . with the stance of his legs as if . . . he was ready to use them." Officer Hernandez testified that the weapons "look like sticks, but they're actually. . . martial arts weapons" called "Kali sticks."

Kosine told the officers several times that he "had to do it" as they were telling him to "drop the sticks, drop the sticks." They ordered him "multiple times" and gave him "multiple opportunities [to] drop the weapons and surrender, but he refused to cooperate." The officers were able to safely take Kosine into custody after Officer

---

[10]Dr. Reed mentioned this in her testimony and addressed the inconsistency between the video and Kosine's claim that he was there to talk about a 4th of July party: "Once she answers the door, he says maybe two words, none of which are about a party, and then you hear her screaming because he has forced his way in and is basically being violent, you know, grabbing her, throwing her down, and you can hear her screaming."

[11]Officer Hernandez testified that "when we got there, the front door was open." Kosine's mother "was in between the front door and the sidewalk area, and she was pointing towards the inside of her house. She told [the officers] she believed that her son had just assaulted somebody and . . . to go get him inside the residence."

Hernandez deployed his taser. The Kali sticks were admitted into evidence.

## II. The evidence is sufficient to support Kosine's conviction for aggravated assault of Camille with a deadly weapon.

In his first issue, Kosine argues that the evidence is insufficient to support the jury's guilty verdict to the charge of aggravated assault of Camille with a deadly weapon as charged in count six of the indictment. He claims that sticks are not deadly weapons per se; that the only evidence of his causing any injury to Camille using the Kali sticks was Camille's testimony that he hit her in the knee with one of the sticks and that she had pain for a couple of weeks from the injuries to her knee; and that there was "no evidence that the sticks could cause death or serious bodily injuries by using them to strike blows."

### A. Standard of review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code

13

Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the factfinder's necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). Factfinders may draw reasonable inferences from the evidence presented at trial as long as each inference is supported by the evidence presented at trial. *Carter v. State*, 620 S.W.3d 147, 150 (Tex. Crim. App. 2021). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

To determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021); *see Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the

defendant was tried. *Hammack*, 622 S.W.3d at 914. The law as authorized by the indictment means the statutory elements of the offense as modified by the charging instrument's allegations. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021); *see Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

## B. Analysis

Count six alleged that Kosine "did use or exhibit a deadly weapon during the commission of the assault, namely a stick, club, baton, or wooden object, that in the manner of its use or intended use was capable of causing death or serious bodily injury."[12] "Serious bodily injury" means "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *See* Tex. Penal Code Ann. § 1.07(46).

Kosine's argument on this issue reads the charge against him and the applicable statute too restrictively. The State did not have to prove that he actually caused death or serious bodily injury or that the Kali sticks were capable of causing death or serious

---

[12]This charge tracks the language of one of the two Texas Penal Code definitions of a deadly weapon. *See* Tex. Penal Code Ann. § 1.07(a)(17)(A), (B).

bodily injury in the manner that he actually used them. It sufficed for the State to prove that, in the manner of its "intended use," the stick with which Kosine struck Camille was "capable of" causing death or serious bodily injury. *See id.* § 1.07(a)(17)(B).

Kosine's sticks were long, cubed, and hard, and Officer Hernandez identified them as "martial arts weapons." Officer Hernandez further testified that he had previously observed Kosine in the park practicing with the sticks and that Kosine "acted like he knew what he was doing with the sticks. He wasn't just aimlessly flailing them. It was like not necessarily was he a trained martial artist, but he was more than a novice as far as the sticks were concerned." During the attack, Camille witnessed Kosine press one of the sticks against Naomi's throat so hard that her face turned red and she was unable to speak. Naomi testified that, after Camille hit him with the bowling pin, Kosine "moved his focus to" Camille and tried to "get her."

Camille testified that, while Kosine was holding her down on the ground by her hair, he not only hit her in the knee with the sticks but also kneed her to the side of the head so hard that she thought she was going to pass out. He told her not to move. Additionally, Dr. Reed testified that, "according to the records," when Kosine was holding Camille down and she tried to get away, he told her that if she got up again, then he was "going to make it really hurt."

Viewing all the evidence in the light most favorable to the jury's verdict, we conclude that a rational factfinder could have found beyond a reasonable doubt that Kosine did use or exhibit the Kali sticks during the commission of the assault of Camille

16

and that in the manner of their "intended use," the sticks were "capable of" causing serious bodily injury. *Id.*

We overrule Kosine's first issue.[13]

### III. The evidence is sufficient to support the jury's rejection of Kosine's insanity defense.

In his second issue, Kosine contends that the evidence supporting his affirmative defense of insanity so greatly outweighs the State's contrary evidence that the jury's verdicts were manifestly unjust. The controlling law on this issue compels us to reject Kosine's argument.

### A. Standard of review and governing law

Insanity is an affirmative defense to prosecution. Tex. Penal Code Ann. § 8.01; *see Reyes v. State*, 480 S.W.3d 70, 72 (Tex. App.—Fort Worth 2015, pet. ref'd); *Williams v. State*, 911 S.W.2d 191, 195 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd). The defendant has the burden of proving an affirmative defense by a preponderance of the evidence. Tex. Penal Code Ann. § 2.04(d). We review a factfinder's rejection of a defendant's affirmative defense for legal and factual sufficiency.[14] *Petetan v. State*,

---

[13]Kosine does not allege that the evidence is insufficient to prove the other elements of aggravated assault with a deadly weapon as charged in count six.

[14]Whether Kosine is arguing legal or factual insufficiency, or both, is unclear from his briefing. As we noted, Kosine contends that the evidence supporting his insanity defense "so greatly outweighs the State's contrary evidence that the jury's verdict was manifestly unjust." That is a factual-insufficiency claim. *See Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2013). But he asks us to "reverse and enter a judgment of

17

622 S.W.3d 321, 337 (Tex. Crim. App. 2021); *Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015).

Texas law excuses a defendant from criminal responsibility if he proves, by a preponderance of the evidence, the affirmative defense of insanity. Tex. Penal Code Ann. § 8.01(a); *Ruffin v. State*, 270 S.W.3d 586, 591–92 (Tex. Crim. App. 2008). The test for determining insanity is whether, at the time of the conduct charged, the defendant— as a result of a severe mental disease or defect—did not know that his conduct was "wrong." *Ruffin*, 270 S.W.3d at 592. In this context, "wrong" means "illegal." *Id.*; *see Bigby v. State*, 892 S.W.2d 864, 878 (Tex. Crim. App. 1994).

In evaluating the legal sufficiency of the evidence to support a factfinder's rejection of an affirmative defense, we first examine the record for more than a scintilla of evidence supporting the jury's implicit rejection of that defense, disregarding all evidence to the contrary unless a reasonable factfinder could not. *Petetan*, 622 S.W.3d at 337; *Matlock*, 392 S.W.3d at 669. If no evidence supports the implicit finding, we must examine the entire record to see if the appellant proved the affirmative defense as a matter of law. *Matlock*, 392 S.W.3d at 669–70. If the record reveals evidence supporting

---

not guilty by reason of insanity." When we reverse because the implicit finding that the appellant did not prove his or her affirmative defense is against the great weight and preponderance of the evidence, we do not render an acquittal; we remand the case to the trial court for a new trial. *Id.* at 672. Regardless of what Kosine means to argue, because we hold that the jury's rejection of his insanity defense was not so against the great weight and preponderance of the evidence as to be manifestly unjust, we will overrule his second issue.

18

the appellant's affirmative defense but if that supporting evidence was "subject to a credibility assessment and was evidence that a reasonable jury was entitled to disbelieve, we will not consider that evidence in our matter-of-law assessment." *Id.* at 670. In other words, we may reverse a factfinder's rejection of an appellant's affirmative defense on legal-sufficiency grounds, and therefore acquit an appellant, only if the evidence conclusively proves the appellant's affirmative defense and no reasonable factfinder was free to think otherwise. *Petetan*, 622 S.W.3d at 337.

In assessing the factual sufficiency of the evidence to support a factfinder's rejection of an affirmative defense, we must consider all the evidence relevant to that defense in a neutral light and determine whether the verdict is so against the great weight and preponderance of the evidence that it is manifestly unjust, conscience-shocking, or clearly biased. *Id.* at 357; *Matlock*, 392 S.W.3d at 670–71. In our review, we may not usurp the factfinder's function by substituting our judgment in the place of its verdict. *Petetan*, 622 S.W.3d at 357; *see Matlock*, 392 S.W.3d at 671. We may sustain this issue and remand the case for a new trial only if, after detailing the relevant evidence and stating how the contrary evidence greatly outweighs the evidence supporting the verdict, we also clearly state why the verdict is so against the great weight of the evidence that it is manifestly unjust, why it shocks the conscience, or why it clearly demonstrates bias. *Petetan*, 622 S.W.3d at 357; *Butcher*, 454 S.W.3d at 20.

## B. Analysis

Kosine concedes on appeal that "[t]he premise that you can tell by [his]

19

inculpatory statements and conduct that he knew his conduct was 'legally' wrong is correct" and that the jury was "permitted to conclude that he knew what he did was 'wrong' because he knew it was illegal." Kosine urges us to "reject" long-standing precedent involving the insanity defense and the meaning of "wrong" in that context. He argues that the current standard for insanity in Texas "is so narrow that a review of the evidence for sufficiency may be virtually meaningless" and that an "adjustment by the Court of its interpretation of what to know 'wrong' means to a severally mentally ill person is needed, at least for purposes of appellate review of evidence for sufficiency."

As an intermediate appellate court, we are bound to follow the pronouncements of the court of criminal appeals. *Wiley v. State*, 112 S.W.3d 173, 175 (Tex. App.—Fort Worth 2003, pet. ref'd). The jury had before it competent expert testimony that, at the time Kosine entered Camille and Naomi's house without their consent, assaulted them both with the Kali sticks, and sexually assaulted Naomi, he knew that what he was doing was wrong and therefore illegal. It was within the jury's province to weigh this testimony—as well as Naomi's and Camille's firsthand accounts of the crime—against Dr. McGarrahan's expert testimony and Kosine's own testimony. *See, e.g., Ex parte Flores*, 387 S.W.3d 626, 640 (Tex. Crim. App. 2012) ("It was the province of the jury to 'fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007))).

But Kosine contends that we "should focus on whether there was any evidence

that Kosine, under his delusion, could have fairly been expected to exercise adequate reasoning abilities while in the throes of psychosis when he committed the acts." That is neither the standard of review for evidentiary sufficiency nor the legal definition of insanity under Texas law.

Because the evidence did not conclusively prove Kosine's affirmative defense, it was legally sufficient to support the jury's implicit rejection of that defense. *See Petetan*, 622 S.W.3d at 337. Furthermore, considering all the evidence relevant to Kosine's insanity defense in a neutral light, we conclude that the jury's verdicts were not so against the great weight and preponderance of the evidence that they were manifestly unjust, conscience-shocking, or clearly biased. *See id.* at 357; *Matlock*, 392 S.W.3d at 670–71. We therefore hold that the evidence is factually sufficient to support the jury's rejection of Kosine's insanity defense.

We overrule Kosine's second issue.

## IV. Conclusion

Having overruled Kosine's two issues, we affirm the trial court's judgment. *See* Tex. R. App. P. 43.2(a).

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  June 6, 2024